STATE OF CONNECTICUT *v.* KATHALEEN LINARES
(10910)

DUPONT, C. J., HEIMAN and SCHALLER, Js.

Argued October 28, 1992—decision released July 23, 1993

*Erin K. Olson,* certified legal intern, with whom was *Timothy H. Everett,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* chief state's attorney, *Joan Alexander,* deputy assistant state's attorney, and *Michael Yavinsky,* law student intern, for the appellee (state).

DUPONT, C. J. The defendant appeals from a judgment of conviction of General Statutes § 2-1d (a) (2) (C) and (E).[1] The conviction resulted from a plea of nolo contendere pursuant to General Statutes § 54-94a[2]

---

[1] General Statutes § 2-1d (a) provides in pertinent part: "A person is guilty of interfering with the legislative process when he . . . (2) Alone or in concert with others, with intent to do so, disturbs, disrupts or interferes with, or attempts to disturb, disrupt or interfere with, any session, meeting or proceeding of the general assembly or either house thereof or any committee of the general assembly or either house thereof, whether within or outside the presence of said general assembly, either house thereof or any such committee by (A) engaging in violent, tumultuous or threatening behavior; or (B) using abusive or obscene language or making an obscene gesture; or (C) making unreasonable noise; or (D) refusing to comply with a lawful order of the police or a member of the office of state capitol security to disperse; or (E) performing any other act which disturbs, disrupts or interferes with any such session, meeting or proceeding . . . ."

[2] General Statutes § 54-94a provides in pertinent part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion . . . to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue

after her motion to dismiss the information, which charged violations of subparagraphs (C) and (E) in the conjunctive, was denied. She claims, on appeal and in her motion to dismiss, that her state and federal constitutional rights of free speech were abridged by enforcement of § 2-1d (a) (2) (C) and (E) and that the subparagraphs of which she was convicted were unconstitutional under both the federal[3] and the state constitutions[4] because they are vague on their face and as applied to her on the particular facts of this case, and because they are overbroad.

If the defendant is correct in her assertion that both subparagraphs are overbroad or vague under either con-

to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion . . . to dismiss. . . ."

Practice Book § 815 (8) provides that a motion to dismiss may be made when the unconstitutionality or invalidity of a governing statute is claimed.

[3] The defendant relies on the first and the fourteenth amendments to the federal constitution. The first amendment to the United States constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The fourteenth amendment to the United States constitution provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

[4] The provisions of the Connecticut constitution on which the defendant relies are as follows:

Article first, § 4: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

Article first, § 5: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

Article first, § 8: "No person shall . . . be deprived of life , liberty, or property without due process of law . . . ."

Article first, § 14: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

stitution, we need not address her claim that the statute abridges her right of free speech under either constitution because the conclusion that both subparagraphs are constitutionally infirm would require us to set aside her conviction. We, therefore, first consider the constitutionality of the subparagraphs of the statute under decisional law relating to the constitutional claims of vagueness and overbreadth.

The warrantless arrest of the defendant arose from an incident that occurred on February 7, 1990, in the gallery of the House of Representatives in the state capitol building. The trial court, in a written memorandum of decision, found certain facts on the basis of its review of video and audio tapes of the occurrence. The court determined that the defendant and others were attending the state of the state address of then Governor William A. O'Neill to the legislature. During the governor's speech, the defendant and others unfurled a banner that read "We Demand Lesbian And Gay Rights, Bill,"[5] and shouted, "gay rights, lesbian rights." The defendant and others were promptly and peacefully removed from the gallery by the capitol police and later arrested. The chanting and the removal of the defendant interrupted the governor's speech for approximately two minutes.

The court concluded as a matter of law that the gallery of the House is a limited public forum, and that the statute is directed toward behavior, not the content of the expression. The court did not deal specifically with the two independent subparagraphs, but lumped them together in its determination that the defendant's

---

[5] The use of the comma before the word "Bill" could indicate that the thrust of any intent of the defendant to disrupt or disturb was directed towards "Bill" O'Neill, then governor, rather than the legislature. Neither the defendant nor the state has attached any significance to the placement of the comma.

first amendment rights were not violated and that the statute was not void for vagueness or overbreadth. Consequently, the court denied the defendant's motion to dismiss.

The defendant's plea of nolo contendere was not an express admission of guilt but a consent to be punished as though she was guilty. *State* v. *Godek,* 182 Conn. 353, 363–65, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981). No evidentiary hearing was requested or held by the trial court prior to the plea.[6] Here, the defendant pleaded nolo contendere to two subparagraphs of the General Statutes, was automatically found guilty of both and fined $90.[7] Conjunctive pleading is a legitimate practice of charging a single offense by one or more specified means, which is allowed by Practice Book § 618. There can be two means by which one crime is committed. *State* v. *Cofone,* 164 Conn. 162, 166, 319 A.2d 381 (1972).

The defendant claims, on the basis of *Brown* v. *K.N.D. Corporation,* 205 Conn. 8, 529 A.2d 1292 (1987), that our standard of review in this case requires that we conduct a de novo review of the record to make an independent determination of the facts. The defendant claims that *Brown* applies not only to civil but to criminal cases.[8] *Brown* held that an independent appel-

---

[6] This case differs from *State* v. *Ball,* 226 Conn. 265, 269, 627 A.2d 892 (1993), in that the state in *Ball* did request a hearing to show its governmental interest in the purposes of the Connecticut Hunter Harassment Act. Furthermore, on the basis of the facts of the present case, a hearing was not necessary to determine the governmental interest in preventing interference in the legislative process.

[7] A violation of General Statutes § 2-1d (a) (2) is a class A misdemeanor, for which the maximum sentence is a fine in an amount not to exceed $2000 and a term of imprisonment not to exceed one year. See General Statutes §§ 53a-28, 53a-42 and 53a-36.

[8] We could find no case in any jurisdiction that decides this issue and the defendant cites none. In *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 334

late determination in first amendment freedom of expression cases is required if first amendment rights are not vindicated in the trial court and the defendant is punished for the exercise of them. We need not decide if *Brown* applies to criminal cases allegedly involving freedom of speech, as well as to civil defamation cases, because here the facts are not in dispute, and an independent review by us would not result in different findings. Both the state and the defendant implicitly agree that the facts, as given by the state, are sufficient to support the defendant's conviction had she been tried, if the statute is constitutional. See *State* v. *Ball,* 226 Conn. 265, 268 n.3, 627 A.2d 892 (1993).

Relatively few decisions involving statutes that allegedly regulate protected speech rest directly on the proscriptions of the first amendment or of state constitutional proscriptions, but instead turn on constitutional due process considerations. A statute may be unconstitutionally vague or overbroad even though no activities prohibited by it are specifically protected by either constitution. That is so because a vague or overbroad statute, whether or not it involves protected speech, violates the due process clauses of both constitutions.[9] An analysis of a statute that implicates first amendment rights to determine if it is vague or overbroad may, however, indirectly lead to the protection of free speech as guaranteed by the state and federal constitutions.

To determine whether a statute with several subparts can survive a facial challenge because it is claimed to

N.E.2d 617 (1975), however, an appellate court made its own inferences from the only evidence, a juvenile court report, introduced at the trial court level, on a motion to dismiss based on the alleged unconstitutionality of a statute involving speech.

[9] The due process provisions of the state and federal constitutions have a similar meaning. *State* v. *Pickering,* 180 Conn. 54, 55–56 n.1, 428 A.2d 322 (1980).

be overbroad or vague when measured against the first amendment, we first review the entire statute[10] in order to determine whether it does implicate free speech. "For first amendment purposes, facial constitutional scrutiny of a criminal statute is warranted if the statute makes unlawful 'a substantial amount of [allegedly] constitutionally protected conduct' even if other parts of the statute may have a legitimate application." Id., 271. Even if only one subparagraph of a statute facially involves protected speech, the statute implicates the first amendment. Id., 272.

There is no decisional guidance for reviewing this statute because it has not been interpreted by a Connecticut court nor has anyone, to the knowledge of the parties, been arrested pursuant to it.[11] General Statutes § 2-1d (a) (2) prohibits a person who intends to disturb, disrupt or interfere with any session, meeting or proceeding of the General Assembly whether within or outside the presence of the General Assembly from

[10] If one or more subsections of a statute are held invalid, the validity of other sections of the same statute are not affected. General Statutes § 1-3; *State* v. *Golino,* 201 Conn. 435, 442, 518 A.2d 57 (1986).

[11] The statute was enacted in 1973. The doctrine of desuetude, the concept that a statute may be void because of its lack of use, is founded on the constitutional concept of fairness embodied in federal and state constitutional due process and equal protection clauses. See *Poe* v. *Ullman,* 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961). "The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the many years that they have been on the statute books bespeaks more than prosecutorial paralysis." Id., 502. Each statute must be judged in terms of whether the defendant had fair notice that she might be prosecuted pursuant to it. *Commission of Legal Ethics* v. *Printz,* 416 S.E.2d 720 (W.Va. 1992). Determinative factors in the application of the doctrine are whether the statute involves traditional criminal behavior, whether it has been openly, notoriously and pervasively violated without prosecution for a long period of time, and whether there has been a conspicuous policy of nonenforcement. Id., 726–27. Here, the defendant did not raise the doctrine at the trial level, although she mentions the doctrine in her appellate brief. We, therefore, have no basis on which to determine the applicability of the doctrine in this case.

(A) engaging in violent, tumultuous or threatening behavior or (B) using abusive or obscene language or making an obscene gesture or (C) making unreasonable noise or (D) refusing to comply with a lawful order of the police or a member of the office of the state capitol security to disperse or (E) performing any other act that disturbs, disrupts or interferes with such a session, meeting or proceeding. The first portion of the statute defines the requisite intent to interfere with the legislative process, and the remainder contains five specific prohibited ways of interfering, disturbing or disrupting the legislative process. Although the defendant is charged only with those subparagraphs that prohibit making unreasonable noise and performing any other act that disturbs, disrupts or interferes with a legislative proceeding, we examine all of the subparagraphs to determine if one or more facially prohibit expressive conduct or speech rather than disruptive behavior. *Colten* v. *Kentucky,* 407 U.S. 104, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972).

The only subparagraph of the statute that facially relates to speech is (B), which prohibits obscene language. All of the remaining subparagraphs involve conduct. The question is whether any one of them implicates the communicative aspects of the prohibited conduct. Conduct can be expressive and communicate an idea. Speech and conduct may coalesce in one act. *Spence* v. *Washington,* 418 U.S. 405, 409–11, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974). A statute that makes it a criminal offense to refuse to comply with a lawful order of the police to disperse is not unconstitutional as violative of the first amendment. *Colten* v. *Kentucky,* supra. Chanting words may be noise or speech, and unfurling a banner with words on it may be conduct involving speech. We conclude that one or more of the subparagraphs implicates the first amendment.

That determination has a clear impact on the defendant's claim that subparagraphs (C) and (E) are unconstitutionally void because they are vague. When a statute involves the possibility of an infringement on free speech, its meaning on its face must be capable of precise ascertainment in order to survive a void for vagueness challenge. *Baggett* v. *Bullitt,* 377 U.S. 360, 372, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964); *State* v. *Proto,* 203 Conn. 682, 696, 526 A.2d 1297 (1987). If a statute is challenged for the same reason but does not involve the first amendment, the determination of constitutionality is dependent on the statute's applicability to the particular facts. *State* v. *Proto,* supra, 697.

When the first amendment is implicated, the defendant may challenge the validity of the statute's application to marginal situations on the ground of vagueness even though his own conduct may fall within the statute's proscription. *State* v. *Pickering,* 180 Conn. 54, 58 n.3, 428 A.2d 322 (1980). This principle means that although a statute operates constitutionally as applied to the particular defendant, if it operates unconstitutionally as to another set of circumstances or theoretical defendants because of its potential application to protected speech it will be held unconstitutional. *State* v. *Sul,* 146 Conn, 78, 81, 147 A.2d 686 (1958). In this case, therefore, we first test subparagraphs (C) and (E) of the statute by their words alone, without regard to the defendant's particular conduct.

If a statute has been previously construed, in a decision of an appellate court, that judicial construction can be used to clarify the statute so that it is no longer vague. *State* v. *Proto,* supra, 698. Legal dictionaries, treatises and dictionary definitions may also be used to save a statute from being constitutionally void for vagueness. Id., 699. General Statutes § 2-1 (d) (a) (2) has never been construed and we, therefore, have no gloss in which to interpret its words. The statute itself

does not define "disturb," "disrupt," "interfere" or "unreasonable." Dictionary definitions, however, clarify the meanings of these words. "Disrupt" means "to upset the order of," or "throw into confusion or disorder"; "disturb" means "to break up or destroy the tranquility or settled state of"; "interfere" means "impede." American Heritage Dictionary (1981). "Unreasonable" is defined as "not governed by or predicated upon reason" or "exceeding reasonable limits." Id. Some of these words when used in another statute, General Statutes § 53a-181a, have been found not to be void for vagueness. *State* v. *Anonymous,* 6 Conn. Cir. Ct. 667, 298 A.2d 52 (1972). "Violent, tumultuous or threatening behavior," "abusive or obscene language or making an obscene gesture" were found to be terms that persons of ordinary intelligence could understand. Id., 669–70; see also *State* v. *Lo Sacco,* 12 Conn. App. 481, 490–91, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987).

In this case, the defendant claims that the statute is both overbroad and vague on its face. These doctrines are so closely related that sometimes they are impossible to separate. The methodology of the analyses are, however, distinguishable, and it is possible for a statute to be void for vagueness, although not void for overbreadth. A statute is overbroad, in terms of the first amendment, if it sweeps within its ambit conduct that is protected by the first amendment and if there is a realistic danger that it can interfere with the first amendment protection of others not before the court. A statute is unconstitutionally vague if it is drawn without clarity enough to apprise the average person and those who enforce the law with sufficient notice of what conduct is criminal. *Smith* v. *Goguen,* 415 U.S. 566, 575, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974); *Grayned* v. *Rockford,* 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972).

Before discussing whether subparagraphs (E) and (C) are unconstitutionally void or overbroad, we note the purpose of General Statutes § 2-1d (a). It is, of course, imperative that our legislature be able to perform its function without disruption, and that citizens have the freedom to challenge their legislators. A governmental body may restrict activity in its buildings. *Act-Up* v. *Walp,* 755 F. Sup. 1281 (M.D. Pa. 1991). The question, here, however, is whether the statute has accomplished that purpose without violating the due process provisions of either the state or federal constitutions.

The trial court found that the words "making unreasonable noise" are content-neutral because they are directed toward disruptive behavior rather than speech. A restriction must be justifiable without regard to the content of the speech involved. Here, the statute is content-neutral because it restricts all of the expressive conduct proscribed by it, without regard to the substance of the expression. Even a statute that involves speech by specific persons, namely people opposed to hunting, thereby implicating the substance of the regulated speech, can be content-neutral. *State* v. *Ball,* supra, 275. The statute here is not limited to particular speech in any way and, we, therefore, agree with the trial court and also conclude that it is content-neutral.

The trial court found that the gallery of the House of Representatives is a limited public forum. The status of the gallery is dependent on whether it consists of public property that the state has made available for use by the public for expressive activity. *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); *Act-Up* v. *Walp,* supra. The gallery was open to the public on the day of the governor's speech but communicative activity was restricted to reasonable approval or disapproval by the public and the elected members of the

legislature were aware that the public was present, observing the session. *Act-Up* v. *Walp,* supra, 1288. The court correctly determined that the gallery was a limited public forum. The prohibition against excessive noise is a reasonable restriction to impose on the public and the statute is sufficiently limited to further the state's significant interest in conducting legislative sessions without disruption, disturbance or interference. See *Heffron* v. *International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 649–51, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981). Ordinarily, these principles are discussed in the context of cases involving only claimed first amendment violations, rather than claims that a particular statute is void for vagueness. See id.; *Perry Education Assn.* v. *Perry Local Educators' Assn.,* supra.

In *Grayned* v. *Rockford,* supra, however, the principles are discussed in the context of a case in which the claim was that a particular statute was vague and overbroad on its face, without any claim that the statute was vague or overbroad as to the particular defendant, and without any claim that the statute violated the first amendment. We have noted these cases in order to set the background for our discussion of the claim that the statute is facially overbroad and vague.

Subparagraph (E) prohibits the performance of any acts that disturb, disrupt or interfere and is a catchall for whatever the other subparagraphs failed to prohibit. In analyzing whether a statute is overbroad, we must decide whether it restricts a significant number of instances of constitutionally protected speech, and whether its application to other persons is substantial. If it can be applied to a number of other persons and situations to inhibit free speech, it is facially invalid even if it can have some legitimate applications. *Houston* v. *Hill,* 482 U.S. 451, 458–59, 107 S. Ct. 2502, 96

L. Ed. 2d 398 (1987). Subparagraph (E) sweeps into its prohibitions conduct that is constitutionally protected. For example, a legislator who filibusters is intentionally engaging in an act that disrupts a legislative proceeding, as is a spectator in the gallery who cheers or boos. Subparagraph (E) is similar to the ordinance in *Houston* v. *Hill,* supra, that was held by the United States Supreme Court to be unconstitutional because of overbreadth. There, the language found to be overbroad was a prohibition of activities that " 'in any manner . . . interrupt any policeman.' " Subparagraph (E) prohibits "performing any other act which disturbs, disrupts or interferes with any . . . session . . . ." We discern no meaningful difference between the two statutes, and hold that subparagraph (E) is unconstitutional as overbroad. The proscriptions of subparagraph (E) are unlimited and cannot be made to conform to due process requirements. See *State* v. *Schriver,* 207 Conn. 456, 468, 542 A.2d 686 (1988). Because we conclude that the subparagraph is void because of its overbreadth, we need not consider whether it is void for vagueness.

We next analyze subparagraph (C) to determine whether it is void for vagueness or overbreadth. Subparagraph (C) prohibits "making unreasonable noise," which is specific behavior. Noise can implicate protected speech when it involves communication. Again, because we are dealing with a statute that allegedly implicates the first amendment, we first examine the words of the statute rather than the particular conduct of the defendant. The words are not overbroad because they do not proscribe other conduct that enjoys first amendment protection, nor do they present a realistic danger that the first amendment rights of others not before the court will be affected.

As previously noted, "unreasonable" defines the prohibited noise as noise that exceeds reasonable limits. The words of subparagraph (C) are not vague because the

average person can understand the prohibition and law enforcement officials are not tempted to enforce the subparagraph arbitrarily and discriminately. The conduct prohibited is not couched in terms so vague that the prohibition can only be the subject of a guess. *State v. Cavallo,* 200 Conn. 664, 667, 513 A.2d 646 (1986). The statute gives fair warning and guarantees that there will not be standardless enforcement. *State v. Schriver,* supra, 460.

"Unreasonable noise" is facially concerned with the volume and timing of speech not its content, and it is constitutionally permissible to prohibit it. 2 A.L.I. Model Penal Code and Commentaries (1980) § 250.2, p. 346; *State v. Anonymous,* supra; *State v. Martin,* 532 P.2d 316 (Alaska 1975); *People v. Fitzgerald,* 194 Colo. 415, 573 P.2d 100 (1978); *People v. Bakolas,* 59 N.Y.2d 51, 449 N.E.2d 738, 462 N.Y.S.2d 844 (1983); *Commonwealth v. Mastrangelo,* 489 Penn. 254, 414 A.2d 54 (1980). The purpose of the restriction is the elimination of excessive noise, not the suppression of particular speech. *Carew-Reid v. Metropolitan Transportation Authority,* 903 F.2d 914, 917 (2d Cir. 1990); see also note, *"Carew-Reid v. Metropolitan Transportation Authority:* Free Expression Sound and Fury," 11 Pace L. Rev. 643, 655 (1991).

The United States Supreme Court has held that an ordinance prohibiting the wilful " 'making of any noise . . . which disturbs or tends to disturb the peace or good order of [a] school session' " is neither unconstitutionally void nor overbroad. *Grayned v. Rockford,* supra, 108. Subparagraph (C) prohibits intentionally "making unreasonable noise." The ordinance in *Grayned* and subparagraph (C) are very similar. Indeed, the latter establishes a quantum of noise, "unreasonable," whereas the former does not. We hold that subparagraph (C) survives the defendant's facial due process constitutionality

attack. The subparagraph gives fair notice that it applies to the intentional disruption of the activities of the legislature.

The defendant also claims that subparagraph (C) is void for vagueness as applied to her. She does not deny that she and others were chanting words that caused the governor to stop his speech, that the chanting began in the middle of sentences, that the words of the chant were unrelated to the content of the speech, and that the speech was interrupted for a period of up to two minutes. Nor does she deny that she intended to attract the attention of the legislature to the cause of gay and lesbian rights.

The defendant argues that as applied to her "making unreasonable noise" can be criminalized only if the words she used that constituted the "noise" incite imminent lawless action or are "fighting words." Basically, the defendant contends that it was the unpopularity of the cause of gay and lesbian rights that provoked her arrest, rather than the "noise."[12] Subparagraph (C) focuses on the intent of the defendant as well as the causal connection between that intent and the disruption itself. The defendant has, by pleading nolo contendere, agreed that she had the requisite intent to disrupt. The governor's speech was in fact interrupted and the noise blanketed the words of the governor so that he could not be heard. It was not the particular words used that caused the governor to stop speaking but the volume of the noise. The subparagraph is not void for vagueness as applied to the defendant. See *State* v. *Cavallo,* supra, 667–70; see also *State* v. *Duhan,* 194 Conn. 347, 359, 481 A.2d 48 (1984).

We must next consider whether subparagraph (C) involves the regulation of protected speech. The state

---

[12] Connecticut passed legislation in 1991 to prohibit discrimination based on sexual orientation. General Statutes §§ 46a-81a through 46a-81r.

argues that "making unreasonable noise" is not speech at all and that, therefore, the state and federal constitutional guarantees of freedom of expression are not involved. A statute will not violate the first amendment even though it restricts speech as long as the restrictions are reasonable as to time, place and manner, are content-neutral, are narrowly tailored to serve a significant government interest and leave open ample alternative channels for communication. *Ward* v. *Rock Against Racism,* 491 U.S. 781, 789, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989).

Constitutionally protected speech includes many things other than thoughts expressed in words. Protected speech can be parades, music, solicitation and receipt of funds, and the use of an amplifier to increase the volume of music electronically. J. Stevens, "The Freedom of Speech," 102 Yale L.J. 1293, 1298 (1993); see *International Society for Krishna Consciousness, Inc.* v. *Lee,* U.S. , 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992); *Carew-Reid* v. *Metropolitan Transportation Authority,* supra. We know of no case, however, nor have the parties cited one, that holds that a blanket prohibition against "making unreasonable noise" prohibits speech that is protected by the first amendment. Although we recognize that some noises can be communication, we conclude that "unreasonable noise" as used in this statute relates to behavior and is not protected speech. The purpose of the prohibition is to prevent the disruption of the legislative process, and requires an intent to disrupt. The focus of the subparagraph is not the expression of an idea or any form of communication but the prohibition of noise so unreasonable as to disrupt.

The words of the chant in this case *implicated* free speech for purposes of determining an overbreadth or void for vagueness claim. That does not mean, however, that the statute inhibited or prevented freedom

of expression protected by the state and federal constitution. Prohibiting a person from intentionally disrupting the legislative process by making unreasonable noise is not to be equated with a prohibition of expounding or communicating ideas. "Unreasonable noise," in this context, has only slight social value and any benefit to be derived from that excessive noise is outweighed by the social interest in maintaining order in the legislature. See *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 2d 1031 (1942); *State* v. *Lo Sacco,* supra, 487.

There is not an endless variety of conduct that can be labelled speech, and thereby gain constitutional protection simply because the person engaging in the conduct claims that she intended to express an idea. *Wisconsin* v. *Mitchell,* U.S. , 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993). Because subparagraph (C) does not involve protected speech, we need not analyze either the federal or state constitutional provisions that guarantee freedom of expression.[13]

We have found subparagraph (C) to be constitutional and subparagraph (E) to be unconstitutional. We must next decide whether the conjunctive nature of the information charging the plaintiff with a violation of § 2-1d (a) (2) (C) and (E) requires that the entire conviction under § 2-1d (a) be set aside.

---

[13] It is now well settled that our state constitution may provide greater rights than the federal constitution. *State* v. *DeFusco,* 224 Conn. 627, 632, 620 A.2d 746 (1993); *State* v. *Oquendo,* 223 Conn. 635, 649, 613 A.2d 1300 (1992); *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992); *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990); *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984); *State* v. *Miller,* 29 Conn. App. 207, 221, 614 A.2d 1229, cert. granted, 224 Conn. 914, 915, 617 A.2d 170 (1992). Because we conclude that subparagraph (C) does not involve protected speech and subparagraph (E) is void for overbreadth, we need not determine if the state constitution affords greater free speech protection than the federal constitution.

The defendant pleaded nolo contendere to two subparagraphs of the same statute, was found guilty and fined. If she had been charged in the conjunctive, had been found guilty by a general verdict of a jury and on appeal one subparagraph was held unconstitutional, the entire conviction would have to be set aside. *Stromberg* v. *California,* 283 U.S. 359, 368, 51 S. Ct. 532, 75 L. Ed. 1117 (1931). This is so because the general verdict of guilty makes it impossible to know whether the jury found her guilty of the unconstitutional or the constitutional portion of the statute. A defendant would be wrongfully convicted if convicted under a statutory alternative for which there was no evidence. *State* v. *Williams,* 202 Conn. 349, 364, 521 A.2d 150 (1987). A judgment cannot be supported unless there is sufficient evidence to establish guilt under each statutory provision upon which the trier may have relied. *State* v. *Reid,* 193 Conn. 646, 666, 480 A.2d 463 (1984). A conviction must be set aside if one of the alternate grounds supporting the verdict is unconstitutional or if one is not sufficiently supported by the evidence. Id., 667 n.22; *State* v. *Marino,* 190 Conn. 639, 651, 462 A.2d 1021 (1983); see *Leary* v. *United States,* 395 U.S. 6, 30, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969).

All of these involved cases occurred after a trial, where it was impossible to know which of the more than one statutory alternative or subparagraph provided the finding of guilt, or where every one of the alternatives could provide the finding of guilt. In a case where the finding of guilt follows a plea, however, the rationale for setting aside the conviction is no longer present. It is clear that here there was a finding of guilt as to both of the subparagraphs, and it is not a matter of conjecture as to which of them caused the finding of guilty. See *State* v. *Eason,* 192 Conn. 37, 42, 470 A.2d 688 (1984).

At the time of sentencing, the defendant had pleaded nolo contendere to two subparagraphs of the statute and the trial court had concluded that both subparagraphs were constitutional. The trial court's sentencing, therefore, was based on convictions of both subparagraphs. Because we set aside the conviction of the defendant under subparagraph (E), the defendant must be resentenced. See *State* v. *Hanson,* 210 Conn. 519, 531, 556 A.2d 1007 (1989).

The judgment of conviction under General Statutes § 2-1d (a) (2) (C) is affirmed, the judgment of conviction under General Statutes § 2-1d (a) (2) (E) is reversed and the case is remanded with direction to render judgment resentencing the defendant accordingly.

In this opinion HEIMAN, J., concurred.

SCHALLER, J., concurring. I agree with the result reached by the majority that General Statutes § 2-1d (a) (2) (E) is unconstitutionally overbroad and that § 2-1d (a) (2) (C) passes constitutional muster. I write separately, however, because it is my firm belief that § 2-1d (a) (2) (C) implicates protected speech and therefore requires an analysis under the free speech provisions of the Connecticut constitution.

I

The majority holds that "[a]lthough we recognize that some noises can be communication, we conclude that 'unreasonable noise' as used in [§ 2-1d (a) (2) (C)] is not protected speech." I respectfully disagree with this aspect of the majority opinion.

Recently, our Supreme Court addressed the issue of what constitutes protected speech. *State* v. *Ball,* 226 Conn. 265, 271, 627 A.2d 892 (1993). At issue in *State* v. *Ball,* supra, was the constitutionality of a statute proscribing persons from harassing or interfering with

the lawful taking of wildlife. The court first held that first amendment scrutiny applies " 'to a statute regulating conduct which has the *incidental effect* of burdening the expression of a particular political opinion.' " (Emphasis added.) Id., quoting *Arcara* v. *Cloud Books, Inc.,* 478 U.S. 697, 702, 106 S. Ct. 3172, 92 L. Ed. 2d 568 (1986). The court further noted that " '[i]t is now settled that constitutionally protected forms of communication include parades, dances, artistic expression, picketing, wearing arm bands, burning flags and crosses, commercial advertising, charitable solicitation, rock music, some libelous false statements, and perhaps even sleeping in a public park.' " *State* v. *Ball,* supra, 272, quoting J. Stevens, "The Freedom of Speech," 102 Yale L.J. 1293, 1298 (1993); General Statutes § 53a-183a. Because the statute at issue in *Ball* encompassed both communicative *as well as* noncommunicative conduct, the court concluded that the statute implicated protected speech.

A similar analysis applies to the present case. It is true that the proscription of § 2-1d (a) (2) (C) against unreasonable noise aims to eliminate intentional disruptions caused by high noise levels. Nevertheless, the statute has the "incidental effect of burdening the expression of a particular political opinion." *State* v. *Ball,* supra, 271. The facts of this case exemplify the burden that the statute imposes. Here, a group of persons engaged in chanting in an effort to express their desire for greater lesbian and gay rights. A proscription against this activity, even if designed to prevent disruptive noise, clearly burdened the expression of a particular political opinion. For these reasons, I disagree with the majority opinion that § 2-1d (a) (2) (C) does not implicate protected speech.[1]

---

[1] The analysis in *State* v. *Ball,* 226 Conn. 265, 267 n.2, 627 A.2d 892 (1993), with respect to the issue of protected speech is based on the first amendment to the United States constitution. The court in *Ball* did not consider

## II

Because, in my view, the statute incidentally burdens protected speech, it is necessary to apply free speech scrutiny to the statute. As a threshold matter, I believe, as the defendant contends, that our state constitution encompasses a broader spectrum of speech protections than those afforded under the first amendment.

It is well established that states are free to interpret their own constitutions in such a way as to extend individual liberties beyond those set forth in the federal constitution. *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); see also W. Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L. Rev. 489 (1977). "Federal law, whether based upon statute or constitution, establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984); *Mesquite* v. *Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982).

In certain contexts, this court and our Supreme Court have indeed construed the Connecticut constitution as expanding individual liberty beyond the bounds of its federal counterpart. See, e.g., *State* v. *Geisler,* 222 Conn. 672, 610 A.2d 1225 (1992) (exclusionary rule provided by the state constitution affords a higher level

---

the issue under the Connecticut constitution. In this case, I do not consider whether the scope of protected speech is broader under our state constitution. Because the statute implicates free speech rights under the federal counterpart, it is unnecessary to address the same issue under the state constitution. "Federal law, whether based upon statute or constitution, establishes a minimum national standard for the exercise of individual rights . . . ." *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984).

of protection than the minimum standard provided by the federal constitution); *State* v. *Miller,* 29 Conn. App. 207, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1027 (1993) (exception to warrant requirement of state constitution for cases involving automobile searches is narrower than exception to federal constitution). Still unsettled in this state, however, is whether our *free speech* clauses offer adequate grounds from which to build a structure that extends beyond that of the first amendment.

Our Supreme Court recently employed several different tools in construing the Connecticut constitution. In *State* v. *Geisler,* supra, 685, the court suggested that an analysis of the state constitution include reference to (1) text, (2) holdings and dicta of the Supreme Court and the Appellate Court, (3) federal precedent,[2] (4) sister state decisions, (5) historical considerations, "including the historical constitutional setting and the debates of the framers" and (6) "economic/sociological" considerations. In doing so, our courts have recognized that their interpretations must not restrict the civil liberties accorded to the national citizenry. *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

I first turn to the text of our state constitution. The framers of our state constitution drafted its free speech provisions in considerably broader language than that of the first amendment. It is well established that "[u]nless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution." *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub

---

[2] See *State* v. *Miller,* 29 Conn. App. 207, 222, 614 A.2d 1229 (1992) (decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law), quoting *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). I, therefore, give full attention to the fact that, in establishing speech freedoms, the framers of this state's constitution chose language considerably different from the first amendment.

Article first, § 4, of the Connecticut constitution provides that "[e]very citizen may freely speak, write and publish his sentiment *on all subjects,* being responsible for the abuse of that liberty." (Emphasis added.) By contrast, the first amendment does not include language protecting free speech "on all subjects." Article first, § 5, provides that "[n]o law shall *ever* be passed to curtail or restrain the liberty of speech or of the press." (Emphasis added.) Unlike the first amendment which provides that "Congress shall pass no law" the use of "ever" in our state constitution offers additional emphasis to the force of the provision. Finally, article first, § 14, provides that citizens have a right, inter alia, "to apply to those invested with the powers of government, for redress of grievances . . . by petition, address or *remonstrance.*" (Emphasis added.) Again, our state constitution offers language, i.e., "remonstrance," that sets forth free speech rights more emphatically than its federal counterpart. While I am not prepared to hold that these textual differences create an *absolute* right to free speech *anywhere at any time,* in my view, these differences warrant an interpretation separate and distinct from that of the first amendment.

The state contends that free speech rights in Connecticut should parallel those embodied in the first amendment. The state specifically relies on the limiting language of article first, § 4, that persons endowed with rights to speak freely are *"responsible for the abuse of that liberty."* (Emphasis added.) I agree that this language indicates that free speech in Connecticut is not absolute. In fact, our Supreme Court, in *State* v. *McGee,*

73 Conn. 18, 29, 46 A. 409 (1900), recognized this very principle. Still, however, this language does not *require* that our courts adopt interpretations of the first amendment in all cases implicating the Connecticut constitution.

Few decisions have addressed the speech provisions of the Connecticut constitution. It is true that, in the final analysis, these few decisions have adopted the reasoning of federal cases interpreting the first amendment. See, e.g., *Cologne* v. *Westfarms Associates,* supra; *Dydyn* v. *Department of Liquor Control,* 12 Conn. App. 455, 531 A.2d 170, cert. denied, 205 Conn. 812, 532 A.2d 586 (1987), cert. denied, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988).[3] Our courts have not, however, foreclosed the possibility of an independent interpretation in a different context. In fact, the two most recent cases considering our speech clauses are patently distinguishable from the present case.

Our Supreme Court in *Cologne* v. *Westfarms Associates,* supra, 50, decided "whether a court of this state may direct that the rights of free speech and petition in our state constitution may be exercised upon *private property* consisting of a large regional shopping center, contrary to the wishes of its owners." (Emphasis added.) After an exhaustive review of the Connecticut constitution, the intent of its framers, and the decisional law of other jurisdictions, the court reasoned that "[i]t is not the role of this court to strike precise balances among the fluctuating interests of *competing private groups* which then become rigidified in the granite of constitutional adjudication." (Emphasis added.) Id., 65. Thus, the court held that under the Connecticut constitution, as under its federal counterpart, a per-

---

[3] But see *Dow* v. *New Haven Independent, Inc.,* 41 Conn. Sup. 31, 43–45, 549 A.2d 683 (1988) *(Berdon, J.,* stating that "[i]t is clear that the state constitution not only protects opinion to the same extent as the federal constitution, but goes further").

son does not have standing to invoke speech clauses against the owner of a private shopping mall.

In *Dydyn* v. *Department of Liquor Control,* supra, 458, this court addressed the issue of whether the department of liquor control can suspend permits to sell liquor when dancers perform "in various states of nudity" on the premises of the permittee. We held, inter alia, that under our state constitution the permittees were not entitled to any greater protection than is afforded under the first amendment. Id., 462–63.

Neither *Westfarms* nor *Dydyn,* however, addressed the issue of whether the state constitution extends the protections of the first amendment when persons want to express themselves on *government property,* specifically the gallery of the General Assembly. These decisions dealt with substantially different aspects of freedom of speech, namely, state action and obscenity. Furthermore, in *Burns* v. *Barret,* 212 Conn. 176, 561 A.2d 1378, cert. denied, 493 U.S. 1003, 110 S. Ct. 563, 107 L. Ed. 2d 558 (1989), our Supreme Court expressed a willingness to engage in an independent interpretation of the state constitution. In *Burns* v. *Barret,* supra, 178 n.1, the court stated that "[t]he defendant has not in his brief argued that the textual differences between our state and federal freedom of speech provisions are of any particular significance in this case." This language indicates that the issue of whether speech can be afforded greater protection under the state constitution remains unsettled. See M. Margulies, "Connecticut's Free Speech Clauses: A Framework and an Agenda," 65 Conn. B.J. 437, 442 (1991). The party advocating such a course, however, must adequately research and present its claim under the state constitution. *Burns* v. *Barret,* supra.

Numerous other jurisdictions have interpreted similar state constitutional provisions as providing more

expansive speech rights than the first amendment. For example, in *Immuno AG.* v. *Moor-Janowski*, 77 N.Y.2d 235, 248, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (1991), a decision involving the parameters of the libel doctrine, the New York Court of Appeals undertook an independent interpretation of article first, § 8, of the New York constitution. That section provides that " 'every citizen may freely speak, write and publish . . . sentiments on all subjects.' " Id., 249. Before redefining the libel doctrine, the court held that free speech under the New York constitution did not mirror federal law, "the [United States] Supreme Court fixing only the minimum standards applicable throughout the nation." See also *Spiritual Psychic Science Church* v. *Azusa*, 39 Cal. 3d 501, 519, 703 P.2d 1119, 217 Cal. Rptr. 225 (1985) (interpreting article first, § 2, of the California constitution which provides, "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right"); *People* v. *Seven Thirty-Five East Colfax, Inc.*, 697 P.2d 348, 353 n.3 (Colo. 1985) (interpreting article second, § 10, which provides, "every person shall be free to speak, write or publish whatever he will on any subject, being responsible for the abuse of that liberty"). These decisions from our sibling states fortify the proposition that our courts should construe Connecticut's free speech provision independent of federal law and, in certain cases, offer enhanced speech liberties.

Connecticut's historical experience further bolsters the viability of an independent constitutional analysis of this state's free speech rights. Before the 1818 Connecticut constitutional convention, civil liberties in Connecticut were in their infancy, particularly freedoms of speech and press. C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 97 (1982). "These were protected neither by stat-

ute nor by a well-articulated set of common law principles." Id.[4] Thus, the Connecticut constitutional convention "overrode the protestations of the Federalist old republicans who still clung to their faith in legislative supremacy and the common law to uphold [speech rights in Connecticut]." Id.

Moreover, in the years immediately preceding our constitution's enactment, Connecticut citizens embraced a philosophy of greater tolerance, moving toward a more culturally diverse society. R. Purcell, Connecticut in Transition: 1775-1818 (Wesleyan Univ. Press 1963) pp. 311-35; W. Horton, "Annotated Debates of the 1818 Constitutional Convention" 65 Conn. B.J. SI-1, SI-4 (1991). This is particularly evident in the struggle to separate church and state. Between 1812 and 1818, the issue of church and state deeply divided political factions. R. Purcell, supra, pp. 320-21. The Federalists continued to support established institutions both religious and secular. Id. At the same time, the Tolerationists strongly advocated the separation of church and state and, as their party name suggests, a movement toward greater tolerance. Id. The Tolerationists gained a major victory with the election of Governor Wolcott in 1817 and, a year later, with the overwhelming placement of their representatives in both houses of the legislature. Id., p. 360. By 1818, it was apparent that the political tide in Connecticut had shifted in the direction of greater tolerance and cultural diversity.[5] Ultimately, these views culminated

---

[4] The first amendment was not applicable to the states until the next century. See *Gitlow* v. *New York,* 268 U.S. 652, 45 S. Ct. 625, 69 L. Ed. 309 (1925).

[5] The New York Court of Appeals has articulated the importance of its state's cultural diversity when considering the extent to which the New York constitution affords greater speech protections than the first amendment to the United States constitution. See *Immuno AG.* v. *Moor-Jankowski,* 77 N.Y.2d 235, 249, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (1991); *Beach* v. *Shanely,* 62 N.Y.2d 241, 255-56, 465 N.E.2d 304, 476 N.Y.S.2d 765 (1984) (Wachler, J., concurring).

in the enactment of the Connecticut constitution. I am convinced, therefore, that our constitution's speech provisions reflect a unique historical experience and a move toward enhanced civil liberties, particularly those liberties designed to foster individuality.

In sum, from my review of the text and history of the Connecticut constitution and the case law of Connecticut and our sibling states, it is my opinion that the free speech clauses of the Connecticut constitution warrant an independent analysis and may, in certain cases, provide greater protection than that afforded under the first amendment. The next task is to discern the scope of the defendant's rights to free expression in the gallery of the General Assembly.

### III

In pursuing independent interpretation of our state constitution, courts may give due consideration to the more fully developed construction of its federal counterpart. In this regard, under the first amendment, the United States Supreme Court has fashioned the public forum doctrine to resolve free speech issues similar to the one before us. In *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983), the court set forth the doctrine in detail noting that this approach involves three forum categories: (1) the traditional public forum, a narrow classification involving streets, parks and sidewalks, (2) the limited public forum, an area other than a traditional public forum that the government has opened to the public, and (3) the nonpublic forum. Courts have strictly scrutinized content regulations affecting persons' speech rights on traditional and limited public fora, while taking a more deferential approach to regulations affecting nonpublic fora. Id.; see also *United States* v. *Kokinda,* 497 U.S. 720, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (characterizing

sidewalk of post office as nonpublic forum and upholding regulation of speech related activities); D. Farber & J. Nowak, "The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication," 70 Va. L. Rev. 1219 (1984) (discussing and criticizing present state of public forum analysis).

Although the United States Supreme Court first articulated the public forum analysis in the 1930s; *Hague* v. *Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939); only recently has the court invoked the doctrine with any regularity. D. Farber & J. Nowak, supra, p. 1221. Under the auspices of the United States Supreme Court, "[p]ublic forum analysis appears to be increasing in importance." Id. Criticism of this doctrine, however, is widespread. In fact, in *United States* v. *Kokinda,* supra, 741 (Brennan, J., dissenting), four justices of the court "questioned whether public forum analysis, as the court has employed it in recent cases, serves to obfuscate rather than clarify the issue at hand." These members of the court were more inclined to decide the constitutionality of a regulation limiting speech related activities on a post office sidewalk in accordance with earlier case law, in particular, *Grayned* v. *Rockford,* 408 U.S. 104, 116, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). According to this precedent, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." Id.

Commentators have also criticized the public forum doctrine as rigid and categorical. D. Farber & J. Nowak, supra.[6] "Classifying a medium of communication as a

---

[6] See also *United States* v. *Kokinda,* 497 U.S. 720, 741–42 n.1, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (Brennan, J., dissenting) (citing numerous authorities for proposition that present public forum analysis is unsound); L. Tribe, American Constitutional Law (2d Ed. 1988) p. 993 ("an excessive focus on the public character of some forums, coupled with inadequate

public forum may cause legitimate governmental interests to be thoughtlessly brushed aside; classifying it as something other than a public forum may lead courts to ignore the incompatibility of the challenged regulations with first amendment values." Id., p. 1224. Ultimately, the doctrine yields "fragmented Courts and inconsistent opinions." Id., p. 1222. Moreover, the doctrine has "clouded consideration of the compatibility of governmental regulation with first amendment values"; id., p. 1223; and "distracts attention from the [free speech] values at stake in a given case." Id., p. 1224.[7]

Keeping in mind the current problems of federal constitutional interpretation, I would choose not to import the categorical public forum analysis to our state constitutional jurisprudence. The adoption of the public forum doctrine for purposes of analyzing our state constitution would likely confuse and hamper the development of free speech rights in this state. Instead, I find *earlier* federal precedent to be more appropriate for interpretations of Connecticut's free speech clauses.[8]

attention to the precise details of the restrictions on expression, can leave speech inadequately protected in some cases, while unduly hampering state and local authorities in others").

[7] Another commentator has addressed the issue of public forum analysis under the Connecticut Constitution. M. Margulies, "Connecticut's Free Speech Clauses: A Framework and an Agenda," 65 Conn. B.J. 437, 449–50 (1991). Professor Margulies has urged that Connecticut courts construe our state constitution in light of *earlier* United States Supreme Court decisions. Id., citing *Grayned* v. *Rockford*, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). As did the four dissenting justices in *United States* v. *Kokinda*, 497 U.S. 720, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (Brennan, J., dissenting), Professor Margulies advocates a return to a more fact-specific inquiry, focusing on the previously stated test in *Grayned*. Under this approach, the nature of the forum remains a factor in the analysis but not necessarily the determinative one.

[8] In undertaking the difficult task of independent state constitutional analysis, "let us welcome assistance whatever its auspices, confident that our traditional learning in the common law will enable us to meet the challenge." E. Peters, "State Constitutional Law: Federalism in the Common Law Tra-

This is not to say that free speech is absolute or that the nature of the forum is not an important factor in assessing the constitutionality of a government restriction. Rather, my concern is that the rigid public forum doctrine would threaten to obscure interpretations of this state's free speech provisions. On the basis of the free speech clauses of the Connecticut constitution, therefore, I view the issue before this court as whether "the manner of expression is basically incompatible with the normal activity of a particular place at a particular time," and, if so, whether the statute restricting expression does so without any reference to its message or content. See, e.g., *Grayned* v. *Rockford,* supra; *United States* v. *Kokinda,* supra (Brennan, J., dissenting).

## IV

In the present case, the manner of expression is incompatible with the normal activity of the General Assembly. The statute restricts persons who, "with the intent to do so, disturb, disrupt or interfere with" the legislative process. Absent this provision, it is conceivable that members of the gallery might cripple the effective operation of the General Assembly. Furthermore, § 2-1d (a) (2) (C) operates without any reference to the content of the expression. Thus, I conclude that, under the Connecticut constitution, § 2-1d (a) (2) (C) is a reasonable, if not a necessary, restriction on expression.

dition," 84 Mich. L. Rev. 583, 593 (1986). Assistance may very well be found in federal constitutional precedent. Furthermore, a dissenting opinion of the United States Supreme Court will criticize the majority holding as straying from precedents. See, e.g., *United States* v. *Kokinda,* 497 U.S. 720, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990). "Some of the barely unsuccessful dissenting opinions of the United States Supreme Court Justices might usefully be incorporated into state constitutional doctrine as well." E. Peters, supra; see, e.g., *State* v. *Miller,* 29 Conn. App. 207, 229, 617 A.2d 170 (1992) (accepting principles set forth in Justice Harlan's dissenting opinion in *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), as consistent with principles of warrant requirement of article first, § 7).

The facts of this case exemplify the appropriateness of § 2-1d (a) (2) (C). Here, the defendant and her colleagues interrupted Governor O'Neill in midsentence when they chanted. The chanting was not a spontaneous reaction to something that the Governor said, but rather it was wholly unrelated to his speech. The chanting was prolonged, lasting nearly one minute and generating enough noise to drown out the governor for approximately thirty seconds. It is clear that the General Assembly cannot effectively carry out its duties when spectators in the gallery express themselves in this manner. In fact, without a regulation of some kind, unreasonable noise in the General Assembly could become so frequent and so boisterous as to undermine entirely the function of our legislature. It follows that § 2-1d (a) (2) (C) restricts activity incompatible with the normal function of the General Assembly and that the restriction is content-neutral. In short, § 2-1d (a) (2) (C) passes state constitutional muster.[9]

I concur with the result reached by the majority.

---

[9] Because federal constitutional law establishes a minimum national standard with respect to individual rights; *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984); *Mesquite* v. *Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982); my conclusion that General Statutes § 2-1d (a) (2) (C) is valid under the state constitution necessarily leads to the same conclusion under the first amendment.