STATE OF CONNECTICUT *v.* KATHALEEN LINARES
(14861)

PETERS, C. J., and CALLAHAN, BORDEN, NORCOTT and KATZ, Js.

Argued November 2, 1994—decision released March 14, 1995

*Timothy H. Everett,* with whom, on the brief, were *Erin K. Olson,* pro hac vice, and *David Polsky,* legal intern, for the appellant-appellee (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Joan Alexander,* assistant state's attorney, for the appellee-appellant (state).

*Martin B. Margulies* and *Martha Stone* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

KATZ, J. The defendant, Kathaleen Linares, challenges the constitutionality of General Statutes § 2-1d (a) (2) (C) and (E),[1] which prohibit intentional interference

---

[1] General Statutes § 2-1d provides in relevant part: "INTERFERENCE WITH THE GENERAL ASSEMBLY; MISDEMEANOR. (a) A person is guilty of interfering with the legislative process when he . . .

"(2) Alone or in concert with others, with intent to do so, disturbs, disrupts or interferes with, or attempts to disturb, disrupt or interfere with, any session, meeting or proceeding of the general assembly or either house thereof or any committee of the general assembly or either house thereof, whether within or outside the presence of said general assembly, either house thereof or any such committee by (A) engaging in violent, tumultuous or threatening behavior; or (B) using abusive or obscene language or making an obscene gesture; or (C) making unreasonable noise; or (D) refusing to comply with a lawful order of the police or a member of the office

with the legislative process. After being charged with interfering with the legislative process in violation of § 2-1d,[2] the defendant moved to dismiss the information, claiming that the statute is unconstitutional both on its face and as applied to the facts of her case, in violation of the first and fourteenth amendments to the United States constitution[3] and the constitution of Con-

of State Capitol Security to disperse; or (E) performing any other act which disturbs, disrupts or interferes with any such session, meeting or proceeding . . . ."

The defendant also challenges the other provisions of General Statutes § 2-1d (a) (2), specifically, (2) (A), (2) (B), and (2) (D). She claims that because she had filed her motion to dismiss prior to the time when the state narrowed its charges to allege violations only of subdivisions (2) (C) and (2) (E), she may now facially challenge § 2-1d (a) (2) in its entirety. She asserts that "[t]he procedural history of the case and the underlying reasons for according standing to make facial challenges to statutes that might otherwise chill freedom of expression together support the defendant's position that she is entitled to challenge the entirety of Gen. Stat. § 2-1d [(a) (2)] on the grounds of overbreadth and facial vagueness." We disagree.

We agree with the defendant that in an appropriate case, the importance of free speech values may permit a defendant to attack a statute on its face, even in a case in which the defendant's conduct may clearly fall within the core meaning of that statute. This principle necessarily presupposes, however, that the defendant has actually been charged with violations of that statute. As we have stated previously, "[o]ur vagueness inquiry—whether facial or as applied—extends only to those portions of the statute that were applied to the defendant in this case. *Smith* v. *Goguen*, [415 U.S. 566, 581, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974)]; *Colten* v. *Kentucky*, 407 U.S. 104, 111 n.3, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972)." *State* v. *Indrisano*, 228 Conn. 795, 804, 640 A.2d 986 (1994). We are unpersuaded that sound vagueness and overbreadth jurisprudence compels a contrary conclusion in this case. Because only charges under subdivisions (2) (C) and (2) (E) were before the trial court when it ruled on the defendant's motion to dismiss; see footnote 5; we need only consider the constitutionality of those provisions.

[2] The state originally charged the defendant generally, in a short form information, with a violation of § 2-1d. In response to the defendant's motion for a bill of particulars, however, the state filed a long form information, narrowing the charges to violations only of § "2-1d (2) (C) and (E)," which actually meant to refer to § 2-1d *(a)* (2) (C) and (E), as acknowledged by the defendant on appeal.

[3] The first amendment to the United States constitution provides: "Congress shall make no law respecting an establishment of religion, or pro-

necticut, article first, §§ 2, 4, 5, 9 and 14.[4] The trial court denied the defendant's motion to dismiss.[5] The defendant subsequently entered a written plea of nolo contendere conditional on her right to appellate review of the denial of her motion to dismiss pursuant to General Statutes § 54-94a and Practice Book § 4003.[6] The

hibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The fourteenth amendment to the United States constitution provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[4] The constitution of Connecticut, article first, provides in relevant part: "Sec. 2. All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and they have at all times an undeniable and indefeasible right to alter their form of government in such manner as they may think expedient.

\* \* \*

"Sec. 4. Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

"Sec. 5. No law shall ever be passed to curtail or restrain the liberty of speech or of the press.

\* \* \*

"Sec. 9. No person shall be arrested, detained or punished, except in cases clearly warranted by law.

\* \* \*

"Sec. 14. The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

[5] Because the state narrowed the charges against the defendant by filing a long form information that alleged that the defendant had violated only subdivisions (2) (C) and (2) (E) of § 2-1d (a), the trial court, when it denied the defendant's motion to dismiss, had before it only the charges brought under those two specific subdivisions of the statute.

[6] General Statutes § 54-94a provides: "CONDITIONAL NOLO CONTENDERE PLEA. APPEAL OF DENIAL OF MOTION TO SUPPRESS OR DISMISS. When a defendant, prior to the commencement of trial, enters a plea of nolo con-

trial court found the defendant guilty as charged in the long form information and fined her $90.

The defendant appealed from that judgment to the Appellate Court, which affirmed the judgment of conviction under § 2-1d (a) (2) (C) and reversed the judgment of conviction under § 2-1d (a) (2) (E). *State* v. *Linares*, 32 Conn. App. 656, 674, 630 A.2d 1340 (1993). The Appellate Court concluded that § 2-1d (a) (2) (E) prohibits constitutionally protected conduct, and invalidated that provision as unconstitutionally overbroad under the first amendment to the United States constitution. Id., 668. The Appellate Court, however, concluded that, because § 2-1d (a) (2) (C), "does not involve protected speech, we need not analyze either the fed-

tendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

Practice Book § 4003 provides in relevant part: "APPEALS OF RULINGS ON MOTIONS TO DISMISS OR SUPPRESS FOLLOWING JUDGMENTS ENTERED UPON CONDITIONAL PLEAS OF NOLO CONTENDERE

\* \* \*

"(b) With the approval of the court, after a hearing to consider any objections thereto, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any motion made prior to the close of evidence, which motion must be specified in such written reservation. If the defendant prevails on appeal, the judgment shall be set aside and the defendant shall be allowed to withdraw the conditional plea of nolo contendere after the case has been remanded to the trial court. The court shall not accept a plea of guilty or nolo contendere pursuant to this subsection where the adverse determination of the specified motion would not have a significant impact on the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere or guilty plea where the record available for review of the ruling upon the specified motion is inadequate for appellate review of the court's determination thereof."

eral or state constitutional provisions that guarantee freedom of expression." Id., 672. Further, the Appellate Court stated that "[b]ecause we conclude that [subdivision (2) (C)] does not involve protected speech and [subdivision (2) (E)] is void for overbreadth [under the federal constitution], we need not determine if the state constitution affords greater free speech protection than the federal constitution." Id., 672 n.13. Concurring in the judgment, Judge Schaller agreed that subdivision (2) (E) is unconstitutional and that subdivision (2) (C) passes constitutional muster, but only after he first determined that subdivision (2) (C) warranted free speech analysis and then analyzed it under the Connecticut constitution, which in his view "encompasses a broader spectrum of speech protections than those afforded under the first amendment." Id., 676 (*Schaller, J.*, concurring).

We granted the defendant's petition for certification to appeal on the issues of the statute's constitutionality both on its face and as applied to the defendant.[7] We also granted the state's petition for certification to cross appeal on the issue of whether subdivision (2) (E) is overbroad in violation of the first amendment to the United States constitution.[8] We agree with the

---

[7] We granted certification as to the following issues:

"1. Whether the defendant's motion to dismiss should have been granted because General Statutes § 2-1d is overbroad, in violation of the Connecticut constitution and the United States constitution?

"2. Whether the defendant's motion to dismiss should have been granted because General Statutes § 2-1d is vague on its face, in violation of the Connecticut constitution and the United States constitution?

"3. Whether the defendant's motion to dismiss should have been granted because General Statutes § 2-1d is vague as applied in the instant case, in violation of the Connecticut constitution and the United States constitution?

"4. Whether the trial court should have granted the defendant's motion to dismiss because the state sought to punish her for political expression protected by the Connecticut constitution and the United States constitution?" *State* v. *Linares,* 228 Conn. 906, 634 A.2d 299 (1993).

[8] We granted the state's petition for certification to appeal, limited to the following issue: "Whether General Statutes § 2-1d (a) (2) (E)'s prohibi-

Appellate Court's conclusion as to subdivision (2) (C), but reject its determination that subdivision (2) (E) is void for overbreadth. Further, although we concur in the Appellate Court's conclusion as to subdivision (2) (C), we disagree with its analysis of the defendant's claims pertaining to that subdivision.

The videotape and audio cassette recording in the record of this case demonstrate the following undisputed facts.

The occasion was Governor William A. O'Neill's budget address to the General Assembly in the Hall of the House of Representatives. The governor, Lieutenant Governor Joseph Fauliso and other state officials were on the podium. The lieutenant governor introduced the governor, and the audience applauded, with some whistling, for thirty-four seconds. The governor then spoke without interruption for approximately two minutes, when his speech was interrupted by applause and whistles for approximately twenty-two seconds.[9] He then continued speaking without interruption for approximately four minutes, when he was again interrupted by applause and whistles for approximately seventeen seconds. He then continued speaking for approximately two minutes, when he was interrupted by applause and whistles for approximately eighteen seconds. He then continued speaking for approximately one minute, when the incident in question occurred.

tion against 'any . . . act which disturbs, disrupts or interferes with' the legislative process is facially overbroad for first amendment purposes?" *State* v. *Linares,* 228 Conn. 907, 634 A.2d 297 (1993).

[9] In this instance, as in all the other instances of the audience interrupting the governor's speech by applause and whistles, the applause and whistling were spontaneous responses to the particular content of the speech at that moment, and ended voluntarily when the governor indicated that he was ready to resume his speech. The legislators themselves participated in the applause for the duration of the interruptions.

The defendant and others were in the gallery of the Hall of the House. The gallery is located directly behind and above the podium, and is the only place in the Hall where members of the public, not otherwise permitted to be either on the floor of the House or on the podium itself, are permitted.[10] It is obvious that anything of any significance that occurred in the front part of the gallery, at the railing overlooking the podium, was within the line of vision of persons in the Hall, who generally faced the podium as the governor delivered his speech.

The defendant unfurled a large pink banner that was tied to the railing with string or rope. Gauging by its comparison to the people behind it, we estimate the size of the banner to be approximately 6 feet by 9 feet. On the banner, within a triangle, was the legend, in large block letters: "WE DEMAND LESBIAN AND GAY RIGHTS, BILL." The content of this message had nothing to do with the content of the governor's speech, either generally or at that particular moment; the speech was devoted to budgetary matters. Simultaneously, the defendant and others chanted or shouted in loud voices, "gay rights lesbian rights," over and over again without stopping.

The chanting and the presence of the unfurled banner, facing the audience in the Hall of the House, continued unabated for approximately one minute and twenty-five seconds. During this period the governor stopped speaking and the audience can be seen on the videotape looking up in the direction of the banner and the chanting. Also, at some point after the banner was unfurled and the chanting began, but after the governor had stopped speaking, the governor looked over

[10] Although this brief description can only be partially gleaned from the videotape—namely, the location of the gallery with respect to the podium—the rest is simply a matter of common knowledge of the physical construction of the Hall of the House, and of the rules of the House.

his left shoulder in the direction of the banner and the chanting. At the end of the one minute and twenty-five seconds, a capitol security officer entered the gallery, seized the banner by untying or tearing it from the railing, and arrested the defendant.

## I

The defendant claims that subdivisions (2) (C) and (E) of § 2-1d (a) are impermissibly vague, facially and as applied, in violation of the United States constitution. The defendant also claims that these provisions are overbroad in violation of the first amendment to the United States constitution. The defendant contends that these provisions, on their face, impermissibly sweep within their proscriptions speech that may not be punished by the government. We disagree.

## A

We first consider whether these provisions are unconstitutionally vague in violation of the United States constitution. "Under the requirements of due process of law mandated by our federal and state constitutions, a penal statute must be sufficiently definite to enable a person to know what conduct he must avoid. *State* v. *Proto*, 203 Conn. 682, 696, 526 A.2d 1297 (1987); *State* v. *Pickering*, 180 Conn. 54, 59–60, 428 A.2d 322 (1980); see *Buckley* v. *Valeo*, 424 U.S. 1, 77, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976); *State* v. *Eason*, 192 Conn. 37, 46, 470 A.2d 688 (1984) [overruled in part on other grounds, *Paulsen* v. *Manson*, 203 Conn. 484, 525 A.2d 1315 (1987)]. [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. *Connally* v. *General Construction Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926); *State* v. *Eason*, supra; *State* v. *Pickering*, supra, 60." *State* v. *Williams*, 205 Conn. 456, 469–70, 534 A.2d 230 (1987).

" '[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.' *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S. Ct. 1186, 71 L. Ed. 2d 362, reh. denied, 456 U.S. 950, 102 S. Ct. 2023, 72 L. Ed. 2d 476 (1982)." *State* v. *Indrisano,* 228 Conn. 795, 803–804, 640 A.2d 986 (1994).

## 1

We apply these principles to determine whether subdivisions (2) (C) and (E) of the statute are vague on their face.[11] We turn first to subdivision (2) (C), which provides that "[a] person is guilty of interfering with the legislative process when he . . . [a]lone or in concert with others, with intent to do so, disturbs, disrupts or interferes with, or attempts to disturb, disrupt or interfere with, any session, meeting or proceeding of the general assembly or either house thereof or any committee of the general assembly or either house thereof, whether within or outside the presence of said general assembly, either house thereof or any such committee by . . . making unreasonable noise." The plain language of this provision, therefore, proscribes only those instances of "unreasonable noise" that: (1) actually interfere with the legislative process; (2) were specifi-

---

[11] Although we stated in *State* v. *Indrisano,* supra, 228 Conn. 795, that the defendant in that case could not mount a facial vagueness challenge because his conduct fell within the challenged statute's core of meaning, this conclusion required us to determine that the statute at issue in that case in fact *had* a core meaning. The determination that a statute has a core meaning and the determination as to whether a statute is facially vague because it has *no* core meaning in essence requires the same analysis. Compare *Parker* v. *Levy,* 417 U.S. 733, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974), with *Kolender* v. *Lawson,* 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

cally intended to interfere with the legislative process; and (3) were causally connected to the resulting interference. Fairly and reasonably interpreted, and viewed in its entirety, this subdivision is not vague on its face.

The defendant claims that this subdivision is vague on its face because it "supplies no objective standard by which to judge whether noise is 'reasonable' or 'unreasonable.' " She contends that "[i]n many instances, 'reasonable noise' is undoubtedly just as disturbing to the legislative process as is 'unreasonable noise.' Presumably, reasonable noise is that which is acceptable to those who enforce the rules, and unreasonable noise is that which is unacceptable. It could be otherwise only if the statute defined 'unreasonable' by objective standards that could be applied consistently, without reference to the meaning of a person's noise or the variable sensibilities of the enforcement officials." We are unpersuaded that the scope of this subdivision bestows upon officials such unfettered discretion; instead, we conclude that the totality of the language of the statute both provides fair notice to potential noisemakers and sufficiently constrains official discretion to enforce the statute such that the subdivision does not "chill" free speech.

Although the defendant cites various state and federal precedents that have invalidated statutes due to facial vagueness, she has cited to none that invalidate a statute because of the infirmities from which this subdivision of § 2-1d (a) is alleged to suffer. As the Appellate Court correctly observed, the phrase "unreasonable noise" lacks a vague quality because the term "unreasonable" denotes objectivity based on the circumstances. Because this statute is clearly related only to the disruption of official legislative proceedings, we are persuaded that an individual "would have little difficulty identifying conduct that would lead to such a result." *State* v. *Indrisano,* supra, 228 Conn. 812; see

*Grayned* v. *Rockford,* 408 U.S. 104, 112, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). "We do not have here a vague, general 'breach of the peace' ordinance, but a statute written specifically for the [legislative] context, where the prohibited disturbances are easily measured by their impact on the normal activities of the [General Assembly]. Given this 'particular context,' the ordinance gives 'fair notice to those to whom [it] is directed.' " *Grayned* v. *Rockford,* supra, 112. This is particularly true in light of the fact that conviction under the statute requires the state to prove that the defendant possessed the specific intent to interfere with the legislative process. The specific intent requirement precludes conviction based on an unintended interference. General Statutes § 2-1d (a) (2) (C); see *Houston* v. *Hill,* 482 U.S. 451, 474, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) (Powell, J., dissenting in part) ("'intent to interfere' element "would make the language of the ordinance more precise, and possibly satisfy the concern as to vagueness").[12]

Moreover, this subdivision does not employ any terms that have been found to denote a subjective standard based on the varying sensibilities of law enforcement officials. See, e.g., *Kolender* v. *Lawson,* 461 U.S. 352, 358–60, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) (phrase "credible and reliable identification" unconstitutionally vague because it encourages "arbitrary enforcement");

---

[12] Unlike the mens rea language employed in the disorderly conduct statute, which we construed and limited in *State* v. *Indrisano,* supra, 228 Conn. 806–809, this statute's mens rea language requires no "predominant intent" gloss. In *Indrisano,* this court adopted that gloss in order to define and limit the ambiguous terms within the phrase "intent to cause *inconvenience, annoyance* or *alarm,*" and thereby comply with the requirements of *Colten* v. *Kentucky,* 407 U.S. 104, 108–109, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972). (Emphasis added.) Id. Because the mens rea language of § 2-1d (a) (2) employs none of these vague terms, such a gloss is unnecessary. See General Statutes § 2-1d (a) (2) (guilty if "with intent to do so, disturbs, disrupts or interferes with . . . [a] proceeding of the general assembly").

*Coates* v. *Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971) (prohibiting individuals from "conduct[ing] themselves in a manner annoying to person passing by" unconstitutionally vague because it creates "unascertainable standard . . . in the sense that no standard of conduct is specified at all"). On the contrary, as noted by the Appellate Court, this subdivision's use of the phrase "unreasonable noise" increased the precision and objectivity of the rest of the subdivision's language, which is similar to language previously found not to be unconstitutionally vague. See *Grayned* v. *Rockford*, supra, 408 U.S. 113–14 ("noise or diversion which disturbs" not unconstitutionally vague).

Additionally, although the defendant has not specifically challenged the statute's use of the terms "disturbs," "disrupts" and "interferes" under her vagueness analysis of this subdivision of the statute, we believe that the narrow meaning of these terms helps this subdivision to pass facial vagueness scrutiny. As the Appellate Court properly observed, "[t]he statute itself does not define 'disturb,' 'disrupt,' 'interfere' or 'unreasonable.' Dictionary definitions, however, clarify the meanings of these words. 'Disrupt' means 'to upset the order of,' or 'throw into confusion or disorder'; 'disturb' means 'to break up or destroy the tranquility or settled state of'; 'interfere' means 'impede.' American Heritage Dictionary (1981)." *State* v. *Linares*, supra, 32 Conn. App. 664–65. Further, in previously concluding that the term "interferes" within the disorderly conduct statute is not unconstitutionally vague, we interpreted that term to mean "disturbs or impedes the lawful activity of another person." (Internal quotation marks omitted.) *State* v. *Indrisano*, supra, 228 Conn. 818, 819.

Construing the language "disturbs, disrupts or interferes with" in light of the statute as a whole; *State* v. *Burney*, 189 Conn. 321, 326, 455 A.2d 1335 (1983); we

are persuaded that the meanings of these terms do not depend on the subjective views of particular individuals. On the contrary, because § 2-1d (a) (2) expressly concerns itself only with how conduct affects official legislative functions such as sessions, meetings or proceedings, rather than how such conduct may affect a particular legislator or other individual, we conclude that the subdivision is limited to actual impediments to the legislative process based on the objective qualities of the conduct. Thus, expressive conduct only "disturbs, disrupts or interferes with" within the meaning of the statute if it can be characterized as doing so without reference to any particular message that it may express. Consequently, expressive conduct does not result in a violation of the statute merely because it causes a particular legislator, or legislators, to become subjectively upset, bothered or otherwise disquieted. In other words, law enforcement officials can only arrest and prosecute persons if some objective quality of their conduct, such as its timing, duration or intensity, creates an impediment to the legislature's proceedings. As a result, these terms have sufficiently definite meanings and help place individuals on adequate notice as to what conduct, expressive or otherwise, is prohibited. See *Ward* v. *Rock Against Racism*, 491 U.S. 781, 794, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) ("[w]hile these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity").

We next address whether subdivision (2) (E) is unconstitutionally vague on its face. Subdivision (2) (E), like subdivision (2) (C), expressly punishes a person for interfering with the legislative process when that person "with intent to do so, disturbs, disrupts or interferes with . . . any session, meeting or proceeding of

the general assembly . . . whether within or outside the presence of said general assembly . . . ." General Statutes § 2-1d (a) (2). The only substantive difference between these provisions is that subdivision (2) (C) prohibits an individual from creating such interference by "making unreasonable noise" and subdivision (2) (E) prohibits an individual from creating such interferences by "performing any other act which disturbs, disrupts or interferes . . . ." Because we have determined that subdivision (2) (C) is not unconstitutionally vague on its face under the United States constitution, our vagueness inquiry as to subdivision (2) (E) turns on one narrow question: does the use in subdivision (2) (E) of the phrase "performing any other act," when construed in light of the statute as a whole, render it unconstitutionally vague?

The defendant argues that "[a] reasonable person reading the statute is unable to determine in advance whether clapping, cheering, hanging a banner, carrying a sign, or performing *any other act* is cause for arrest. The greater concern is that enforcement authorities are vested with virtually unlimited discretion to arrest or not arrest, based on their own subjective notions of what appears to be disturbing, disruptive or interfering with the legislative process." (Emphasis in original.) Further, the defendant emphasizes that "[i]t strains credulity to assert that, without further statutory, regulatory or judicial guidance, the Capitol Police would alight on a proper understanding of what the statute punishes and what it does not." We disagree.

Contrary to the defendant's argument, the use in subdivision (2) (E) of the phrase "any other act," when viewed in light of our construction of the rest of the language of the statute, does not afford law enforcement officials unlimited discretion to arrest or not to arrest. In light of our interpretation of the language

"disturbs, disrupts or interferes with," both subdivisions (2) (C) *and* (2) (E) expressly prohibit officials from making arrests on the basis of their own subjective beliefs or viewpoints. Instead, under *both* provisions, officials can make an arrest only if the nature of an individual's conduct, rather than any viewpoint expressed by the conduct, creates interference with legislative proceedings. Further, under *both* subdivisions, the "particular context" of an official legislative proceeding gives individuals adequate notice as to what would constitute interference. See *Grayned* v. *Rockford*, supra, 408 U.S. 112.

Moreover, as in the case of subdivision (2) (C), any imprecision in the language of subdivision (2) (E) is tempered by the specific intent requirement of the statute. The specific intent requirement decreases the possibility that an individual will unwittingly engage in punishable expressive conduct. See *Houston* v. *Hill*, supra, 482 U.S. 474 (Powell, J., dissenting in part) ("intent to interfere" element "would . . . possibly satisfy the concern as to vagueness"). Consequently, although we may agree with the defendant that the phrase "any other act," in isolation, does not limit itself in a constitutionally precise manner, we conclude that subdivision (2) (E), when read as a whole, has a meaning that places individuals on sufficient notice as to what conduct it proscribes and adequately restricts the discretion of law enforcement officials. The words of subdivision (2) (E) "are marked by flexibility and reasonable breadth, rather than meticulous specificity . . . but we think it is clear what the ordinance *as a whole* prohibits." (Emphasis added; internal quotation marks omitted.) *Grayned* v. *Rockford*, supra, 408 U.S. 111.

2

Additionally, the defendant cites to no relevant authority in support of her claim that subdivisions

(2) (C) and (E) are unconstitutionally vague as applied to the present facts.[13] Rather, she merely states that the statute is unconstitutional because it "did not provide the defendant with reasonable notice that her activity was illegal and because the record shows that the police decision to arrest the defendant was made, without statutory guidance, in a setting where the defendant's behavior was set apart from that of others by the disapprobative content of her expression—not the fact that she was engaged in expression." Her rendition of the problems with the statute, however, ignores the fact that her conviction pursuant thereto required a finding of: (1) a specific intent to interfere with the legislative process; (2) actual interference with the legislative process; and (3) a causal connection between the two. General Statutes § 2-1d (a) (2) (C) and (E). We are unconvinced that she could not know her conduct would fall within the parameters of the statute.

Further, the defendant's claim that law enforcement officials singled out her speech as "unreasonable noise" fails to persuade us that these provisions of the statute are vague as applied to her. Even if we assume the defendant's characterization that others in the audience in attendance made "loud and sustained sounds of approval at numerous points in the speech" and that "[t]hey were not punished," our review of the record indicates that the audience responded to the normal flow of the governor's speech with appropriately timed

---

[13] The defendant cites generally to *Houston* v. *Hill*, supra, 482 U.S. 451, *Colten* v. *Kentucky*, supra, 407 U.S. 111, *Coates* v. *Cincinnati*, supra, 402 U.S. 616, *Thornhill* v. *Alabama*, 310 U.S. 88, 97–98, 60 S. Ct. 736, 84 L. Ed. 1093 (1940), *State* v. *Indrisano*, supra, 228 Conn. 795, and *State* v. *Coleman*, 96 Conn. 190, 196, 113 A. 385 (1921). Of these cases, only *Colten* and *Indrisano* specifically considered a claim of vagueness as applied. See *Colten* v. *Kentucky*, supra, 110; *State* v. *Indrisano*, supra, 813–15. Those cases do not support the defendant's argument, however, because they not only rejected the vague as applied claims at issue in them, but they also provide no discernible basis for a contrary result in this case. *Colten* v. *Kentucky*, supra, 110; *State* v. *Indrisano*, supra, 813–15.

and moderated levels of expression.[14] In contrast, the defendant's expression halted the governor in midsentence and prevented him from resuming his address to the legislature for nearly one and one-half minutes. We therefore concur with the trial court's finding that "[t]he *noise level* interfered with and caused a stopping of the governor's speech." (Emphasis added.) Further, although the defendant argues that "[t]he fact is that the defendant was prosecuted under . . . [subdivision (2) (E)] for *unfurling a banner* bearing a political slogan" and that such use of a banner is specifically permitted under capitol regulations, we are unpersuaded that the defendant did not know that her use of a large banner, in a position near the governor and in conjunction with her chanting, would subject her to arrest and prosecution under subdivision (2) (E) for interfering with the governor's speech. Thus, we conclude that subdivisions (2) (C) and (E) are not unconstitutionally vague under the United States constitution as applied to the defendant.

## B

The defendant also contends that subdivisions (2) (C) and (E) of § 2-1d (a) are overbroad in violation of the

---

[14] The Appellate Court concluded that "[w]e need not decide [whether to conduct a de novo review of the record to make an independent determination of the facts] because here the facts are not in dispute, and an independent review by us would not result in different findings." *State* v. *Linares,* supra, 32 Conn. App. 661. We agree with the defendant that the nature of her "as applied" constitutional claims required the Appellate Court to conduct an independent review of the record. See *Houston* v. *Hill,* supra, 482 U.S. 458 n.6; *Brown* v. *K.N.D. Corp.,* 205 Conn. 8, 11–12, 529 A.2d 1292 (1987). In reviewing the trial court's legal conclusion about whether the statute is vague or otherwise unconstitutional as applied to the defendant, the Appellate Court should have reviewed the available evidence, including the exhibits, as we do here, to determine whether the trial court ignored evidence concerning the application of the statute. See *Houston* v. *Hill,* supra, 458 n.6. Of course, such independent review was unnecessary for the Appellate Court's consideration of the defendant's facial vagueness and overbreadth claims because an analysis of a "facial" type of claim is not dependent on the facts of a particular case.

first amendment to the United States constitution. "A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. *Grayned* v. *Rockford*, supra, [408 U.S.] 114. A single impermissible application of a statute, however, will not be sufficient to invalidate the statute on its face; rather, to be invalid, a statute must reach a substantial amount of constitutionally protected conduct. *Houston* v. *Hill*, [supra, 482 U.S. 458]; *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, [supra, 455 U.S. 494]; see *State* v. *Proto*, supra, [203 Conn.] 707." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 205 Conn. 472. A defendant may challenge a statute as facially overbroad under the first amendment, even if the defendant's conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's "chilling effect" on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every defendant has the right not to be prosecuted for expression under a constitutionally overbroad statute. R. Fallon, Jr., "Making Sense of Overbreadth," 100 Yale L.J. 853, 867–75 (1991); see also *Massachusetts* v. *Oakes*, 491 U.S. 576, 581–84, 109 S. Ct. 2633, 105 L. Ed. 2d 493 (1989) (O'Connor, J., plurality opinion) (discussing overbreadth doctrine's "prophylactic," or third party based, justification); L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-27, p. 1024 (court's invalidation of statute due to overbreadth often "doing no more than judging the party before it by a permissible standard").[15]

---

[15] Also, it is a necessary predicate to free speech analysis that the government's action has, in some way, implicated the free exercise of speech. *State* v. *Ball*, 226 Conn. 265, 270, 627 A.2d 892 (1993). In other words, if the statute regulates conduct only, i.e., conduct which has no arguable expressive component, then such regulation does not impermissibly curtail freedom of speech. The Appellate Court concluded that subdivision (2) (C) does not trigger free speech analysis because the term " 'unreasonable noise'

To determine whether a statute reaches a substantial amount of constitutionally protected conduct, we must first interpret its language and determine the scope of its prohibitions. As we outlined above, the plain language of § 2-1d (a) (2) (C) proscribes only those instances of "unreasonable noise" that: (1) actually interfere with the legislative process; (2) were specifically intended to interfere with the legislative process; and (3) were causally connected to the resulting interference. Thus, on its face, this statute does not prohibit speech or other expressive conduct unless and until the character of the conduct, not its message, impedes the legislative process. Further, the statute does not attempt to punish "making unreasonable noise" unless the actor does so with the specific intent to interfere with the legislative process. Similarly, the statute does not punish simply "any other act" under subdivision (2) (E), but only those acts that meet the above qualifications.

Nonetheless, the defendant claims that these provisions are overbroad due to various linguistic infirmi-

as used in this statute relates to behavior and is not protected speech." *State* v. *Linares*, supra, 32 Conn. App. 671. The state argues that the statute does not merit free speech analysis on the additional ground that the statute proscribes only the constitutionally unprotected, "injurious" element of speech. According to the state, the proscribed speech is "injurious" and thus unprotected because, by interfering with the legislative process, it is incompatible with "ordered liberty."

These arguments go too far. Free speech scrutiny, in order to protect expression adequately, must be triggered by a threshold finding that particular government regulation has the incidental effect of burdening expression. See *State* v. *Ball*, supra, 226 Conn. 270. Thus, although consideration of particular expressive conduct's effect on the legislature is relevant to determine, under the rubric of free speech analysis, whether the government may constitutionally prohibit that conduct, such consideration of the effect cannot be used to preclude the constitutional inquiry from ever taking place. Because the proscription of "unreasonable noise" by subdivision (2) (C) clearly contemplates a restriction on some types of speech and the ban of "any other act" by subdivision (2) (E) necessarily may include forms of speech, we conclude that free speech analysis of both provisions is appropriate here.

ties. She cites the phrase "whether within or outside the presence of said general assembly, either house thereof or any such committee" as creating "a locational element in the statute that makes it apply *anywhere*." (Emphasis in original.) She contends that, consequently, "[c]ivil rights protestors on the capitol lawn who refuse to comply with an order to disperse . . . and who instead seek redress of their grievances by stamping their feet, clapping and singing would be subject to arrest. That is precisely the conduct held to be constitutionally protected and *not* prosecutable as a breach of peace." (Emphasis in original.)

Further, the defendant contends that the phrase "making unreasonable noise" is overbroad because although the term "unreasonable" ordinarily is susceptible to a dictionary definition, its union with the undefined term "noise," which is susceptible to many definitions, makes the entire phrase overbroad. Consequently, she contends that we must place a "fighting words" gloss on the entire phrase. Without such a gloss, in her view, "political messages delivered that are undesired may be judged unreasonable noises while welcomed messages will seem eminently reasonable." We are unpersuaded that this subdivision casts so wide a net.

In analyzing whether these subdivisions proscribe a substantial amount of protected conduct, we note at the outset that the first amendment in all contexts " 'forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.' *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 804 [104 S. Ct. 2118, 80 L. Ed. 2d 772] (1984)." *Lamb's Chapel* v. *Center Moriches Union Free School District*, 508 U.S. 384, 394, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993); see *Cornelius* v. *NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 806, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985) (*Cor-*

*nelius*) (government may not curtail speech "solely to suppress the point of view" of the speaker). Viewpoint neutral regulations, however, can be determined to be unconstitutional only after they have been analyzed under a forum based approach. *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983) (*Perry*).

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. . . . [Such locations include] streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' *Hague* v. *CIO*, 307 U.S. 496, 515 [59 S. Ct. 954, 83 L. Ed. 1423] (1939). In these quintessential public forums, the government may . . . enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, supra, 460 U.S. 45. Such close scrutiny is appropriate in these forums because such properties possess long-standing traditions of public usage. R. Post, "Between Governance and Management: The History and Theory of the Public Forum," 34 UCLA L. Rev. 1713, 1759 (1987) (tradition of public usage provides "point of distinction between public and nonpublic forums").

At the other extreme, courts recognize that some government properties are decidedly "nonpublic" for first amendment purposes. "[On public] property which is not by tradition or designation a forum for public communication . . . the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because

public officials oppose the speaker's view." *Perry,*
supra, 460 U.S. 46; see *International Society for
Krishna Consciousness, Inc.* v. *Lee,* 505 U.S. 672,
678–79, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992) *(Lee);*
*State* v. *Ball,* 226 Conn. 265, 272–73, 627 A.2d 892
(1993); see generally L. Tribe, supra, § 12-24. In other
words, "the constraint imposed upon the Government
is nothing more than a rational-basis requirement."
*Cornelius,* supra, 473 U.S. 821 (Blackmun, J., dis-
senting).

"[An intermediate category] consists of public prop-
erty which the State has opened for use by the public
as a place for expressive activity. The Constitution for-
bids a State to enforce certain exclusions from a forum
generally open to the public even if it was not required
to create the forum in the first place. . . . Although
a State is not required to indefinitely retain the open
character of the facility, as long as it does so it is bound
by the same standards as apply in a traditional public
forum." *Perry,* supra, 460 U.S. 45–46. The government
creates such a "designated" public forum "by inten-
tionally opening a nontraditional forum for public dis-
course. . . . [T]he Court has looked to the policy and
practice of the government to ascertain whether it
intended to designate a place not traditionally open to
assembly and debate as a public forum. . . . The Court
has also examined the nature of the property and its
compatibility with expressive activity to discern the
government's intent." *Cornelius,* supra, 473 U.S. 802.

When a government opens a nontraditional forum
to public expression, it does not create a designated
public forum unless it intends to permit a wide range
of expressive activity; id., 804–805; and property
opened to some, but not all types of speech remains
a nonpublic forum. Although it must permit expression
of all viewpoints within the narrow category of speech
that the government has intended to authorize, it may

exclude other categories of speech. See *Lamb's Chapel v. Center Moriches Union Free School District*, 959 F.2d 381, 387 (2d Cir. 1992), rev'd on other grounds, 508 U.S. 384, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993); *Deeper Life Christian Fellowship, Inc.* v. *Board of Education*, 852 F.2d 676, 679 (2d Cir. 1988).

Thus, it is clear that modern public forum analysis under the United States constitution focuses first on the category of public property at issue in the case. R. Post, supra, 34 UCLA L. Rev. 1766. Only after a court has labeled a particular public property as a traditional, designated or nonpublic forum does the court then consider to what extent the government may restrict speech there. See *Perry*, supra, 460 U.S. 46. Because restrictions on speech in public forums receive the highest level of scrutiny and those in nonpublic forums are subject to the lowest; *Lee*, supra, 505 U.S. 678–79; a court's initial categorization of property, as a practical matter, necessarily determines whether a particular restriction on speech will be invalidated. See C. Dienes, "The Trashing of the Public Forum: Problems in First Amendment Analysis," 55 Geo. Wash. L. Rev. 109, 118 (1986). Scholars suggest that this modern categorical approach implicitly, if not explicitly, reflects the United States Supreme Court's position that a government, in its proprietary function as "owner" of public lands, like any owner of private property, may choose to exclude certain classes of speech. See id., 112 ("seeds of the modern nonpublic forum doctrine" found in court's application of private property concepts to public property); R. Post, supra, 34 UCLA L. Rev. 1722–24, 1743 (notion of government acting in its proprietary function drives modern public forum analysis).

Applying the federal forum approach to the present case, we recognize that the gallery of the Hall of the House in the capitol arguably may be classified as a pub-

lic forum dedicated to specific uses by the public.[16] This particular area fails to qualify as a traditional public forum because, unlike parks or streets, the gallery has not historically been devoted to public debate. See *Act-Up* v. *Walp*, 755 F. Sup. 1281, 1287 (M.D. Pa. 1991) (gallery of chamber of Pennsylvania House of Representatives not traditional public forum). To conclude that it is a designated public forum would be to recognize the unique nature of the gallery and the narrow type of public involvement that traditionally occurs there. See id., 1288 (describing limited "communication" between public in gallery and elected officials). This conclusion would also recognize the distinction between the specific qualities of the gallery, an area open only to public viewing and limited public expression, and the traditional nature of other areas in and around the capitol. Compare id., 1288 (gallery had been used only for quiet observation and for passively communicating a citizen presence to legislators), with *Reilly* v. *Noel*, 384 F. Sup. 741, 744 (D.R.I. 1974) (rotunda at statehouse had followed "open-door" policy); see also *Edwards* v. *South Carolina*, 372 U.S. 229, 238, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963) (recognizing that grounds of statehouse appropriate for protest). If we were to determine that the gallery of the capitol is such a designated public forum, we would then have to apply the most rigorous level of scrutiny and invalidate subdivisions (2) (C) and (E) as overbroad prohibitions unless they qualify as reasonable time, place and manner restrictions that are content-neutral, narrowly tailored to serve a significant government interest and leave

---

[16] We recognize that the statute proscribes conduct in locations other than the gallery of the Hall of the House, and that, to resolve the defendant's facial overbreadth challenge, we must examine the constitutionality of the statute's proscriptions in each such location. We need not classify each such location as a particular type of "forum," however, because, even in the most speech protective forum, the proscriptions contained in § 2-1d (a) (2) (C) and (E) would be consistent with the first amendment.

open ample alternative channels of communication. See *Perry*, supra, 460 U.S. 45–46.

Because the gallery has been opened to the public only for the limited purpose of viewing and allowing minimal participation in the legislative process by moderate and timely expressions of approval or disapproval, however, it seems possible, under federal forum analysis, that this part of the capitol appropriately may be designated a nonpublic forum. See *Cornelius*, supra, 473 U.S. 802. Similarly, locations other than the capitol that house official legislative proceedings, such as public hearings, may be considered to be nonpublic forums because the public likewise has only been given a limited expressive role in such places. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Id. If that were the case, we would uphold the statute "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, supra, 460 U.S. 46. Nonetheless, we need not conclusively categorize the forum at issue, because we conclude that subdivisions (2) (C) and (E) qualify as reasonable time, place and manner restrictions and that these subdivisions therefore pass constitutional muster even under the most stringent standard.

In any type of forum, from traditional public to nonpublic, it is permissible to impose content-neutral "time, place and manner" regulations on speech that are narrowly tailored to serve a significant governmental interest and that " 'leave open ample alternative channels for communication.' " *Ward* v. *Rock Against Racism*, supra, 491 U.S. 791. We initially discuss the governmental interest in prohibiting interferences with the General Assembly. The legislature operates under a constitutional mandate in our democratic state govern-

ment. The constitution of Connecticut, article third, § 1, provides for the vesting of the legislative power in the Senate and the House of Representatives. Article third, § 2, authorizes the meeting of the General Assembly and delineates the General Assembly's power to meet in regular and special sessions as needed. Further, article third, §§ 3 through 5, establish the General Assembly's role as a representative body. Equally important to this case, our state constitution requires the governor to convey to the General Assembly "information of the state of the government, and recommend to their consideration such measures as he shall deem expedient." Conn. Const., art. IV, § 11.

Like the United States Congress, our state legislature, in order to execute this constitutional mandate effectively, must retain the power "to preserve itself, that is, to deal by way of contempt with direct obstructions to its legislative duties." *Marshall* v. *Gordon*, 243 U.S. 521, 537, 37 S. Ct. 448, 61 L. Ed. 881 (1917); see also *Jurney* v. *MacCracken*, 294 U.S. 125, 147–50, 55 S. Ct. 375, 79 L. Ed. 802 (1935) (discussing congressional power to prevent obstructions to legislative process). Thus, it must have "the right to prevent acts which in and of themselves inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed." *Marshall* v. *Gordon*, supra, 542; see *White* v. *Norwalk*, 900 F.2d 1421, 1425-26 (9th Cir. 1990) (discussing city council's need to be free from disruptions). Consequently, it is clear that the state has a significant interest in ensuring that the General Assembly, whether sitting in a session, meeting, proceeding or committee, has the opportunity to fulfill its mandate free from objectively unreasonable interferences.

In emphasizing the strength of the state's interest in maintaining a functional General Assembly, we do

not suggest that such an interest may be wielded by the government to stifle completely public expression in the Hall of the House, or other locations of official legislative proceedings. The public assuredly enjoys a right to reasonable expression at government locations of all types. See, e.g., *Tinker* v. *Des Moines Independent Community School District*, 393 U.S. 503, 514, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) (reversed conviction for wearing black armbands to school in protest of Vietnam war); *Edwards* v. *South Carolina*, supra, 372 U.S. 238 (reversed conviction of protestors who sang, clapped and stomped feet outside statehouse on its grounds). This undeniable public right to reasonable expression does not mean, however, that a member of the public "has an absolute constitutional right to use all parts of [the capitol] or its immediate environs for [that individual's] unlimited expressive purposes." *Grayned* v. *Rockford*, supra, 408 U.S. 117–18.

Indeed, although the defendant asserts that the phrase "whether within or outside the presence of said general assembly, either house thereof or any such committee" included in § 2-1d (a) (2) creates "a locational element in the statute that makes it apply anywhere," we conclude that the statute, as a whole, is narrowly tailored to protect the state's interests. Under subdivision (2) (C), an individual is never subject to arrest or prosecution for "making unreasonable noise" outside the presence of an official legislative proceeding unless that person intends *and* effects an actual interference with that proceeding. This subdivision appropriately recognizes that "unreasonable noise" can succeed in its aim even if it is created "outside" the presence of the targeted proceeding. Merely critical expression outside the capitol, however, could not be punished; see *Boos* v. *Barry*, 485 U.S. 312, 318–19, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988); instead, the state would necessarily have to prove that the characteris-

tics of the expression, rather than the message it contained, intentionally and actually interfered with official proceedings inside the building. Inherently limited in this way, these subdivisions merely place reasonable constraints on the "time, place or manner" of expressive conduct, and they preserve " 'ample alternative channels for communication.' " See *Ward* v. *Rock Against Racism*, supra, 491 U.S. 791.

Moreover, in light of the vital state interests involved and the facially narrow language employed, we reject the defendant's contention that we must place a "fighting words" gloss on the phrase "unreasonable noise." As correctly noted by the defendant, courts often have recognized that application of a "fighting words" gloss can save a broad breach of the peace statute from a constitutional overbreadth claim. See, e.g., *Marks* v. *Anchorage*, 500 P.2d 644 (Alaska 1972); *In re Brown*, 9 Cal. 3d 612, 617–19, 510 P.2d 1017, 108 Cal. Rptr. 465 (1973), cert. denied, 416 U.S. 950, 94 S. Ct. 1959, 40 L. Ed. 2d 300 (1974); *Commonwealth* v. *Juvenile*, 368 Mass. 580, 595–97, 334 N.E.2d 617 (1975), superseded by statute as stated in *Commonwealth* v. *Unnamed Defendant*, 22 Mass. App. 230, 492 N.E.2d 1184 (1986). These cases are irrelevant to the present context, however, because they involved statutes that were not narrowly tailored to the nature of a particular site or the needs of specific government institutions. In other words, a "fighting words" gloss is inappropriate here because "unreasonable noise" can create an interference with the legislative process regardless of whether the "noise" is characterized as "fighting words." For instance, if, during floor debates on a bill, a member of the gallery shouted slogans loudly in order to express her disapproval with the pending legislation, such expression could objectively be characterized as "unreasonable noise" even if her actual words were not susceptible to a "fighting words" designation. Con-

sequently, we conclude that subdivision (2) (C) is not overbroad in violation of the first amendment to the United States constitution because it is a reasonable restriction of time, place and manner that is narrowly tailored to serve the significant state interest in preserving a reasonably efficient legislative process and that leaves open ample alternative channels of communication.

For similar reasons, we must reject the Appellate Court's observation that subdivision (2) (E) "is similar to the ordinance in *Houston* v. *Hill*, supra, [482 U.S. 451,] that was held by the United States Supreme Court to be unconstitutional because of overbreadth," and its conclusion that "[w]e discern no meaningful difference between the two statutes, and hold that [subdivision (E)] is unconstitutional as overbroad." *State* v. *Linares*, supra, 32 Conn. App. 668. First, § 2-1d (a) (2) (E) applies only to disruptions of official meetings of the General Assembly. This locational element limits the statute's restrictive effect on protected speech. See *Grayned* v. *Rockford*, supra, 408 U.S. 112, 117–18. Second, subdivision (2) (E) applies only if an individual acts with the specific intent to disturb, disrupt or interfere. We agree with Justice Powell's recognition in *Houston* that such a specific intent element can save an otherwise overbroad statute because such a requirement narrows the statute's applicability by excluding from its ambit those whose expression may have innocently or unknowingly caused a disturbance. See *Houston* v. *Hill*, supra, 482 U.S. 474 (Powell, J., dissenting in part). Third, subdivision (2) (E), as interpreted above, only applies if conduct, expressive or otherwise, "disturbs, disrupts or interferes with" an official legislative proceeding due to its characteristics and not because of any message it may have conveyed. The statute therefore does not permit an arrest or prosecution that is based on the subjective views of law enforce-

ment officials or the varying sensibilities of individual legislators. See *Boos* v. *Barry,* supra, 485 U.S. 318–19 (statute invalid because it grants officials too much discretion); *Houston* v. *Hill,* supra, 465 (statute invalidated because it "provide[s] the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them"). Consequently, the state may not arrest or prosecute under subdivision (2) (E) unless: (1) the defendant had the specific intent to impede an official legislative proceeding; and (2) the defendant's conduct, rather than any message it might have contained, actually caused that impediment. Thus, subdivision (2) (E) is not overbroad in violation of the first amendment to the United States constitution.

## II

The defendant next claims that § 2-1d (a) (2) (C) and (E) are vague, both on their face and as applied, in violation of the due process provisions of the Connecticut constitution. She argues that these subdivisions fail to satisfy the independent protections against the enforcement of vague laws afforded under our state constitution because they lack " 'minimal guidelines to govern law enforcement.' " The defendant further claims that these statutory provisions are overbroad in violation of the Connecticut constitution because they impermissibly proscribe expressive conduct at the capitol that is protected under the expansive free speech provisions of our state constitution. We disagree.

## A

We need not dwell on the defendant's vagueness claims under the Connecticut constitution. The defendant principally bases her independent state constitutional vagueness claims on the authority of *State* v. *Coleman,* 96 Conn. 190, 113 A. 385 (1921). In *Coleman,* this court denounced indefinite criminal laws that "leave the constitutional liberties of a citizen to be

defined and protected by the good impulses of a subordinate official entrusted with unlimited discretion." Id., 196. Although we acknowledge that *Coleman* buttresses the defendant's general claim that the Connecticut constitution independently protects free speech from the dangers of arbitrary and selective enforcement based on viewpoint, we cannot discern any reason for this to cause us to analyze these issues any differently under the Connecticut constitution than we analyzed them under the federal constitution.

In short, we have considered in detail the defendant's vagueness claims under the federal constitution, and she has failed to persuade us that our state constitution mandates a different analysis or contrary result. As we discussed above, § 2-1d (a) (2) (C) and (E) give individuals adequate notice of what conduct they prohibit. Further, the language of these provisions, when read in light of the statute as a whole, sufficiently guides law enforcement officials in the execution of their duties. Thus, unlike the statute at issue in *Coleman* that gave officials *"unlimited"* or *"absolute and uncontrolled"* discretion; (emphasis added) id., 196–97; the subdivisions of § 2-1d in question do not permit unconstitutionally unrestrained discretion under the Connecticut constitution. Moreover, because we have concluded that the defendant's specific conduct clearly falls within the statute, we are unpersuaded that these subdivisions are vague as applied to her conduct.

## B

The defendant also claims that § 2-1d (a) (2) (C) and (E) are overbroad in violation of the free speech provisions of the Connecticut constitution. Her state constitutional claim is in two parts. First, she contends that we should reject modern federal forum analysis in favor of a more flexible, fact specific approach similar to that utilized by the United States Supreme Court prior to

its adoption of the *Perry* forum based model. Second, she argues that, under this more flexible approach, the subdivisions of the statute should be invalidated. We agree with the defendant's first argument but reject the second.

Under the prior approach, the United States Supreme Court's first amendment analysis often relied not on any consideration of the government's proprietary right to exclude, but only on whether the particular speech in issue was consistent with the uses of the specific public property involved. See C. Dienes, supra, 55 Geo. Wash. L. Rev. 112; accord *Grayned* v. *Rockford*, supra, 408 U.S. 104; *Brown* v. *Louisiana*, 383 U.S. 131, 86 S. Ct. 719, 15 L. Ed. 2d 637 (1966); *Edwards* v. *South Carolina*, supra, 372 U.S. 229. The central issue under that approach was "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. . . . [I]n assessing the reasonableness of a regulation, [a court weighs] heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest." *Grayned* v. *Rockford*, supra, 116–17. This emphasis on basic compatibility, rather than on categorization of particular "types" of public property, reflected the court's attempt "to serve the first amendment value of maximizing social communication." R. Post, supra, 34 UCLA L. Rev. 1731.

In deciding whether our state constitution demands such an interpretation, we acknowledge that federal constitutional law sets minimum national standards for individual rights and that states may afford individuals greater protections under their own state constitutions. *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993); *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992); *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). Although we often look to United States Supreme Court precedent when construing

related provisions in our state constitution, we may determine that " 'the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro*, 197 Conn. 219, 235–36, 496 A.2d 498 (1985).' " *State* v. *Geisler*, supra, 684, quoting *State* v. *Marsala*, 216 Conn. 150, 160, 579 A.2d 58 (1990).

To determine whether our state constitution affords greater rights than the federal constitution, we consider the following "tools of analysis": (1) the "textual" approach—consideration of the specific words in the constitution; (2) holdings and dicta of this court and the Appellate Court; (3) federal precedent; (4) the "sibling" approach—examination of other states' decisions; (5) the "historical" approach—including consideration of the historical constitutional setting and the debates of the framers; and (6) economic and sociological, or public policy, considerations. *State* v. *Miller,* supra, 227 Conn. 380–81; *State* v. *Diaz*, 226 Conn. 514, 530–31, 628 A.2d 567 (1993); *State* v. *Geisler,* supra, 222 Conn. 685. Applying this analysis, we decline to follow the modern, forum based approach currently employed to resolve claims under the first amendment to the United States constitution that concern abridgement of speech on public property. Instead, we agree with Judge Schaller's concurrence in the Appellate Court and adopt the "compatibility" test, as expressed in *Grayned* v. *Rockford*, supra, 408 U.S. 116–17, for claims brought under the Connecticut constitution that involve restrictions on speech on public property. See *State* v. *Linares*, supra, 32 Conn. App. 686 (*Schaller, J.,* concurring).

The defendant's freedom of speech claims implicate various sections of our state constitution. "The state

constitutional framework for protection of the right of free speech rests principally upon the provisions of article first, §§ 4 and 5 of the constitution of Connecticut." *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 71, 469 A.2d 1201 (1984) (*Peters, J.,* dissenting). Article first, § 4, provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Further, article first, § 5, provides that "[n]o law shall ever be passed to curtail or restrain the liberty of speech or of the press." Also relevant to the defendant's claim, article first, § 14, provides that "[t]he citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

It is instructive to compare the language of these sections to the corresponding language of the United States constitution. See U.S. Const., amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). Our state constitution includes in article first, § 4, the word "publish," a term not found within the United States constitution. Other courts, construing the term "publish" in the context of similarly worded state constitutions, have found that the term creates expanded communicative rights for the public. See *Tate* v. *Akers*, 409 F. Sup. 978, 981–82 (D. Wyo. 1976), aff'd, 565 F.2d 1166 (10th Cir. 1977) (construing Wyoming constitution); *South Holland* v. *Stein*, 373 Ill. 472, 479–80, 26 N.E.2d 868 (1940) (Illinois constitution).

Moreover, as Judge Schaller noted, article first, §§ 4, 5 and 14, also include other language that suggests that our state constitution bestows greater expressive rights on the public than that afforded by the federal consti-

tution. *State* v. *Linares,* supra, 32 Conn. App. 678 (*Schaller, J.,* concurring). "Article first, § 4, of the Connecticut constitution provides that '[e]very citizen may freely speak, write and publish his sentiments *on all subjects,* being responsible for the abuse of that liberty.' (Emphasis added.) By contrast, the first amendment does not include language protecting free speech 'on all subjects.' Article first, § 5, provides that '[n]o law shall *ever* be passed to curtail or restrain the liberty of speech or of the press.' (Emphasis added.) Unlike the first amendment which provides that 'Congress shall pass no law' the use of 'ever' in our state constitution offers additional emphasis to the force of the provision. Finally, article first, § 14, provides that citizens have a right, inter alia, 'to apply to those invested with the powers of government, for redress of grievances . . . by petition, address or *remonstrance.'* (Emphasis added.) Again, our state constitution offers language, i.e., 'remonstrance,' that sets forth free speech rights more emphatically than its federal counterpart. . . . [T]hese differences warrant an interpretation separate and distinct from that of the first amendment." *State* v. *Linares,* supra, 678. We are persuaded that *Grayned'*s fact specific, flexible approach will offer more protection to freedom of speech as envisioned in our state constitution. See *Cologne* v. *Westfarms Associates,* supra, 192 Conn. 69–72 (*Peters, J.,* dissenting) (discussing independent vitality of free speech protections under state constitution).

The case law of this state also supports our adoption of the more speech protective *Grayned* approach. As early as 1921, this court looked to the constitution of Connecticut to protect individuals from laws that gave officials unlimited discretion to limit freedom of speech. *State* v. *Coleman,* supra, 96 Conn. 195–96. In doing so, the *Coleman* court looked beyond the less speech protective approach then followed by the United States

Supreme Court in interpreting the federal constitution, and stated that "in determining whether [the ordinance] violates the Constitution of Connecticut, we must be guided by our own public policy and our own precedents." Id., 195; see *State* v. *McKee*, 73 Conn. 18, 28–29, 46 A. 409 (1900) (discussing importance of free expression in democratic society).

Moreover, we have recognized that our state constitution "is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes*, supra, 209 Conn. 115. This concern for "contemporary effectiveness" would be undermined if we followed federal forum analysis, which affords the most rigorous protection of speech only at "traditional" forums and narrowly defines "traditional" to exclude modern public gathering places often otherwise compatible with public expression. See, e.g., *Lee*, supra, 505 U.S. 680 (airport not public forum because not traditionally "used for purposes of expressive activity").

A body of federal case law concerning this particular issue of free speech lends considerable support to our adoption of a flexible approach. As discussed previously, prior to its return to the more rigid, forum based categorization of public property, the United States Supreme Court followed the flexible approach espoused in *Grayned* v. *Rockford,* supra, 408 U.S. 104. This model of first amendment analysis required a case-by-case balancing of the right to free speech against the competing interest of preventing unreasonable interference with the "normal activity" of a particular place. Id., 116–17. Free from the modern inquiry containing varying levels of judicial scrutiny, the *Grayned* model focused not on the labeling of property as "traditional public" or "nonpublic," but on whether the specific use

of particular government property compelled some level of speech regulation. Many dissents and concurrences of the United States Supreme Court have advocated for the rejection of the forum approach in favor of the unified, *Grayned* type balancing test. See, e.g., *Lee*, supra, 505 U.S. 695 (Kennedy, J., concurring) ("inquiry must be an objective one, based on the actual, physical characteristics and uses of the property"); *United States* v. *Kokinda*, 497 U.S. 720, 737, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (Kennedy, J., concurring) (public forum jurisprudence, "to retain vitality," must consider objective characteristics of governmental property and its customary public use); *Greer* v. *Spock*, 424 U.S. 828, 843, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) (Powell, J., concurring) (inquiry should have focused on *Grayned*'s "basic incompatibility" test), and 860 (Brennan, J., dissenting) (flexible approach should have been used to determine whether particular speech "basically compatible with the activities otherwise occurring at the locale").

These justices have emphasized that the use of the unified, balancing test is necessary to preserve the value of free speech in light of the realities of public expression in modern life. See, e.g., *Lee*, supra, 505 U.S. 697 (Kennedy, J., concurring) (without unified "compatibility" approach that ignores mere historical analysis, "our forum doctrine retains no relevance in times of fast-changing technology and increasing insularity"). Similarly, some commentators and scholars have resoundingly advocated for a return to a flexible, unified approach focused on speech "compatibility." See R. Post, supra, 34 UCLA L. Rev. 1765–66 and n.213 (discussing overwhelming support for adoption of *Grayned* approach).

Indeed, one commentator has noted that the *Grayned* approach "is designed to maximize the speech which the government is constitutionally required to tolerate,

consistent with the appropriate and needful use of its property. This design flows naturally from the first amendment's central objective of ensuring 'uninhibited, robust, and wide-open' public debate." R. Post, supra, 34 UCLA L. Rev. 1766, quoting *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). We are persuaded by these observations concerning the flexibility of the *Grayned* approach and the failings of the current federal model; accordingly, we believe that our adoption of the *Grayned* approach will best protect free speech under our state constitution. This conclusion finds support from the decision of at least one other state court interpreting its own state constitution's speech protections. See *U.C. Nuclear Weapons Labs Conversion Project* v. *Lawrence Livermore Laboratory*, 154 Cal. App. 3d 1157, 1164-65, 201 Cal. Rptr. 837 (1984) (adopting *Grayned* test under constitution of California).

Further, our decision to adopt the more speech sensitive approach of *Grayned* under our state constitution is supported by the history of free speech in Connecticut. In *Cologne*, this court's majority opinion discussed the historical underpinnings of free speech under the Connecticut constitution and concluded that the constitutional framers were concerned primarily with curbing undue interference from the government. *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 60–62. Similarly, the dissent in *Cologne* discussed the well established importance of free speech in society and analyzed the broad protections to speech expressly incorporated into the Connecticut constitution. Id., 69–71, 76–80 (*Peters, J.*, dissenting). Additionally, Judge Schaller's historical analysis sheds light on this state constitutional question. "Before the 1818 Connecticut constitutional convention, civil liberties in Connecticut were in their infancy, particularly freedoms of speech and press. C. Collier, 'The Connecticut Decla-

ration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition,' 15 Conn. L. Rev. 87, 97 (1982). 'These were protected neither by statute nor by a well-articulated set of common law principles.' Id. Thus, the Connecticut constitutional convention 'overrode the protestations of the Federalist old republicans who still clung to their faith in legislative supremacy and the common law to uphold [speech rights in Connecticut].' Id.

"Moreover, in the years immediately preceding our constitution's enactment, Connecticut citizens embraced a philosophy of greater tolerance, moving toward a more culturally diverse society. R. Purcell, Connecticut in Transition: 1775-1818 (Wesleyan Univ. Press 1963) pp. 311–35; W. Horton, 'Annotated Debates of the 1818 Constitutional Convention,' 65 Conn. B.J. SI-1, SI-4 (1991). This is particularly evident in the struggle to separate church and state. Between 1812 and 1818, the issue of church and state deeply divided political factions. R. Purcell, supra, pp. 320–21. The Federalists continued to support established institutions both religious and secular. Id. At the same time, the Tolerationists strongly advocated the separation of church and state and, as their party name suggests, a movement toward greater tolerance. Id. The Tolerationists gained a major victory with the election of Governor Wolcott in 1817 and, a year later, with the overwhelming placement of their representatives in both houses of the legislature. Id., p. 360. By 1818, it was apparent that the political tide in Connecticut had shifted in the direction of greater tolerance and cultural diversity. Ultimately, these views culminated in the enactment of the Connecticut constitution. [We are] convinced, therefore, that our constitution's speech provisions reflect a unique historical experience and a move toward enhanced civil liberties, particularly those liberties designed to foster individuality." *State* v.

*Linares*, supra, 32 Conn. App. 681–83 (*Schaller, J.*, concurring). This historical background indicates that the framers of our constitution contemplated vibrant public speech, and a minimum of governmental interference, which would be best fulfilled by the less intrusive *Grayned* model.

Finally, it is clear that our adoption of the flexible, *Grayned* approach will best enable our courts to adapt the central tenets of free speech jurisprudence to the ever changing nature of public expression and communication in modern society. As aptly expressed by Justice Kennedy, "[i]n a country where most citizens travel by automobile, and parks all too often become locales for crime rather than social intercourse, our failure to recognize the possibility that new types of government property may be appropriate forums for speech will lead to a serious curtailment of our expressive activity." *Lee*, supra, 505 U.S. 697–98 (Kennedy, J., concurring). Further, this flexible approach prohibits the government from unilaterally and unnecessarily limiting speech at public locations; it avoids the "grant of plenary power [that] allows the government to tilt the dialogue heard by the public, to exclude many, more marginal, voices." Id., 702.

With these principles in mind, we nonetheless must reject the defendant's overbreadth claims under the Connecticut constitution. As we outlined previously, the *Grayned* test requires the government, under the Connecticut constitution, to permit free speech and public expression on government property up to the point when such free expression becomes "basically incompatible with the normal activity of a particular place at a particular time. . . . [I]n assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest." *Grayned* v. *Rockford*, supra, 408 U.S.

116–17. This standard balances the vital role of free expression in a democratic society with the need for reasonably functional governmental institutions and mechanisms. "The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." (Internal quotation marks omitted.) Id., 116.

Because subdivision (2) (C) narrowly prohibits only conduct that amounts to "unreasonable noise" *and* that intentionally creates an impediment to an official legislative proceeding because of characteristics such as its timing, loudness and duration, rather than any message it may convey, this subdivision facially limits itself to expression that is "basically incompatible" with the business of the General Assembly. Subdivision (2) (E) is also limited so as to prohibit only an act that is intended to interfere with a legislative proceeding *and*, in fact, interferes with such a proceeding because of its characteristics rather than because of any message it conveys. Subdivision (2) (E), as does subdivision (2) (C), therefore expressly restricts itself to expression that is "basically incompatible" with the business of the General Assembly. This conclusion recognizes that public expression must yield at the point where the General Assembly "is prevented from accomplishing its business in a reasonably efficient manner." *White* v. *Norwalk*, supra, 900 F.2d 1426. "Where an examination of all the relevant interests indicates that certain expressive activity is not compatible with the normal uses of the property, the First Amendment does not require the government to allow that activity." *Cornelius*, supra, 473 U.S. 820 (Blackmun, J., dissenting) (applying *Grayned* test).[17]

---

[17] We therefore must qualify the defendant's broad assertion that "the state capitol is a forum—unlike a school, library or courthouse—whose 'characteristic nature and function' *includes* being a forum in which the citizens 'apply to those invested with the powers of government, for redress

III

We next consider the defendant's claim that the trial court should have granted her motion to dismiss because her arrest and prosecution were based on her constitutionally protected political expression. She argues that this court should adopt the three part balancing test, enunciated in *State* v. *Hardin*, 498 N.W.2d 677 (Iowa 1993), and *In re Kay*, 1 Cal. 3d 930, 464 P.2d 142, 83 Cal. Rptr. 686 (1970), that, in the

---

of grievances, or other proper purposes, by petition, address or remonstrance.' Art. I, § 14." (Emphasis in original.) The defendant's position incorrectly seems to imply that because the capitol is an appropriate place, or arguably even *the most* appropriate place, to engage in political speech, then all speech in all parts of the capitol, regardless of its type, timing or disruptive effect, is per se "compatible" there. This suggestion ignores the fact that the government appropriately may enact reasonable restrictions of time, place and manner that are narrowly tailored to further significant governmental interests and that accord room for ample alternative channels of communication. See *Ward* v. *Rock Against Racism*, supra, 491 U.S. 791. Further, although we heed the defendant's citation to the constitution of Connecticut, article third, § 16 ("debates of each house shall be public"), General Statutes § 2-1a (a) (authorizing General Assembly to adopt, inter alia, rules consistent with public's right to free expression), and various regulations pertaining to public conduct at the capitol, we reject any implication that individuals thereby possess the right to inject their political views into official legislative proceedings in disregard of how that expressive conduct likely will disrupt those same proceedings.

At the same time, we must reject the state's broad contention that "whether the defendant's expressive activity in the House gallery either fell within the statute and impeded the functioning of the legislature or constituted protected speech should be based upon the extent to which the provisions of the state constitution and the legislature's rules, precedents, and customs permit non-members to express themselves directly in the proceeding in question." Such a position inherently reflects a narrow view of expressive rights akin to that embodied in federal "public forum" jurisprudence. The rules, precedents, and customs of the General Assembly often will help inform whether particular expression is "basically incompatible" with the normal activities at the capitol. These standards, however, cannot limit, in and of themselves, the extent of permissible public expression at the capitol; if they did, the government could stifle expression that posed no risk of preventing the legislature "from accomplishing its business in a reasonably efficient manner." *White* v. *Norwalk*, supra, 900 F.2d 1426.

defendant's view, attempts to balance "the expressive rights of speakers and dissident audience members" at public events of a political nature. The defendant would have us assess: (1) the nature of the meeting involved; (2) whether the activity substantially impaired the conduct of the meeting; and (3) whether the defendants knew, or should have known, that their conduct violated an applicable custom, usage, or rule of the meeting. *In re Kay*, supra, 943. Applying this formula to her case, the defendant contends that her prosecution fails the test because the governor's address was a "political event," her " 'activity' did not seriously 'impair' the occasion," she "scarcely could have known that her chant was not as acceptable as loud, sustained applause or booing," and "the capitol police should have requested the defendant to curtail her expression before proceeding with arrest." We are unpersuaded.

Although the defendant crafts this as a claim separate and distinct from her vagueness and overbreadth claims, we are unconvinced that the so-called *Kay-Hardin* test is anything more than an adaptation of the *Grayned* model of free speech analysis to the context of a "public meeting" or "political rally." See *In re Kay*, supra, 1 Cal. 3d 943 (characterizing meeting as "large, public celebration held outdoors in a public park, featuring, in the course of a political campaign, a public official as the principal speaker"). It is noteworthy that the specific ordinance at issue in *In re Kay* had prohibited willful disturbances at " '*any* assembly or meeting, not unlawful in its character' "; (emphasis added) id., 937–38; and that the relevant conduct had occurred in a public park during a city sponsored Fourth of July celebration.[18] In light of these circumstances, that court

---

[18] Citing *In re Kay* further, the defendant argues that the state should be required to give a warning prior to removing or arresting an individual under these subdivisions of § 2-1d. The defendant seems to contend that such a procedure is *necessary* to give individuals fair warning that their

concluded that it needed to apply such a test to determine whether the ordinance at issue really was an unconstitutionally overbroad restriction based on viewpoint. Id., 943.

Even if we were to agree in principle with the use of a balancing test in *In re Kay,* a determination that we need not make in this case, we have already applied this test, as tailored to the particular statute and circumstances of this case, to the defendant's claims and rejected them in part II B of this opinion. As discussed previously, the challenged subdivisions of the statute are narrowly tailored to prohibit only conduct, expressive or otherwise, that is intended to impede and does impede an official legislative proceeding. In the words of the court in *In re Kay,* § 2-1d (a) (2) (C) and (E) pass constitutional muster because they "[authorize] the imposition of criminal sanctions only when the defendant's activity itself—and *not* the content [or, more accurately, the viewpoint] of the activity's expression—substantially impairs the effective conduct" of an official legislative proceeding. (Emphasis in original.) *In re Kay,* supra, 1 Cal. 3d 942.

Moreover, our independent review of the record does not support the defendant's claim that the government utilized the statute to punish her solely for the expression of her particular viewpoint. Unlike the circumstances underlying the decision in *In re Kay,* the defendant's conduct here impeded the governor's

---

conduct, expressive or otherwise, has the effect of interfering with the legislative process. We must reject such a broad contention because it fails to recognize that expression often may be of such a quality that it is clearly an objective interference to a legislative proceeding. In the present case, for instance, by the time law enforcement officials approached the defendant and her associates, the chanting had already prevented the governor from speaking for a significant period of time. Further, she fails to recognize that the decision in *In re Kay* required law enforcement officials to issue warnings "[i]n instances in which the appropriate standard of conduct lies in doubt . . . ." *In re Kay,* supra, 1 Cal. 3d 945.

address because of the inappropriate timing, loudness and duration of the chanting, and because of the combined effect of the chanting and her distracting use of the banner, which was positioned immediately to the left of the governor's location and which drew away the attention of the legislators in attendance. Compare *In re Kay*, supra, 1 Cal. 3d 944 ("prosecution failed to show that the activities substantially impaired the conduct of the meeting"). In other words, the defendant's conduct constitutionally supports a conviction under § 2-1d (a) (2) (C) and (E) because the manner of her communication, rather than the viewpoint expressed in her message, intentionally interfered with an ongoing legislative proceeding.[19] Further, the defendant offered no evidence that others had engaged in similar intentional interferences with official legislative proceedings, but had not been punished.

The judgment of the Appellate Court is reversed in part, and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion PETERS, C. J., and BORDEN and NORCOTT, Js., concurred.

CALLAHAN, J., concurred in the result.

---

[19] The defendant attempts to show that these subdivisions permit law enforcement officials to enforce them in an arbitrary and discriminatory manner by alluding to the doctrine of "desuetude," the concept that a statute may be unconstitutional because of its lack of use. We agree with the Appellate Court that, because the defendant did not raise this doctrine at the trial level, we have an insufficient record upon which to evaluate its potential application to her case. See *State* v. *Linares*, supra, 32 Conn. App. 662 n.11.